JULIA M. VAILL *vs.* DONALD T. McPHAIL *et al.*

JUNE 25, 1913.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)   *Equity.   Fraud.   Confidential relations.*

Complainant, a woman seventy-two years of age, had from time to time endorsed notes for her nephew, until she was obligated through her endorsements to the amount of $7,000. At the request of the nephew, in order to obtain a further loan of $1,000, complainant gave to the payee of the notes

a bond for $8,000 secured by mortgage upon her real and personal estate
and obtained the surrender of the notes for $7,000 and a further advance of
$1,000 to the nephew. Complainant claimed that she was old and inex-
perienced in business, and that her nephew was her business agent occupying
a fiduciary and confidential relation to her.

On bill against the nephew and the mortgagee to have the mortgages cancelled
on the ground that mortgagee secured them with full knowledge of the
relations between complainant and her nephew:—

*Held*, that the relations between them were not of that general and intimate
character which would of themselves necessarily raise a suspicion of fraud in
the transactions between her and respondents.

*Held*, further, that it being established that complainant understood the nature
of the obligation which she was incurring, the advice of a third party was
unnecessary and respondents were under no obligation in that respect.

*Held*, further, that complainant did not execute the mortgages through any
undue influence exerted upon her by either respondent, but for the purpose of
assisting the nephew.

(*2*)   *Equity.   Fraud.*

The fact that a conveyance or other transaction is made without professional
advice or consultation with friends and is improvident, if not coupled with an
inadequacy of price is not in itself a sufficient ground for relief, provided the
parties were both able to judge and act independently and did act upon
equal terms and fully understood the nature of the transaction and there was
no undue influence or circumstances of oppression.

(*3*)   *Equity.   Fraud.   Parent and Child.*

Transactions between a parent and child or other near relatives may be carried
on under such circumstances as to remove all suspicion of fraud. This is
especially so if the one obtaining the benefit is one who would naturally be
the recipient of the other's bounty.

BILL IN EQUITY.   Heard on appeal of respondents and sus-
tained.

VINCENT, J.   This is a bill in equity brought by Julia M.
Vaill, of Pelham Manor, New York, against Dr. Donald T.
McPhail and the complainant's nephew, Theodore V. Bar-
ton, both of the city of New York.

The complainant seeks, by her bill, to have a certain
bond, together with two mortgages securing the same,
executed and delivered by her to the respondent McPhail
and covering certain property in the town of New Shoreham,
Rhode Island, declared to be void and ordered to be de-

livered up and cancelled; that said respondent McPhail may be enjoined from enforcing said bond, foreclosing said mortgages, and from exercising any powers granted to him thereby or therein; that the respondent McPhail be ordered to reconvey said premises and property and that the respondent Barton be ordered to pay to the complainant such sum or sums of money as may, upon a proper accounting, be found to be due to her from him.

The complainant asks this relief on the ground that if she did execute said bond and mortgages she did so unwittingly and without consideration, at the request of and for the benefit of the respondent Barton, who at the time was her confidential agent, by whom she was influenced in the execution of these instruments and that the said respondent McPhail, at the time of the execution and delivery of said bond and mortgages, had full notice of all these facts.

The complainant's bill also sets up her ownership of the property in New Shoreham and her transaction there of a summer hotel business under the name of "Vaill Cottages;" that she is seventy-two years of age, unmarried, in failing health, and entirely inexperienced in and ignorant of business affairs and incapable of attending to and understanding the same; that she was consequently obliged to entrust the management of her hotel business to agents; and that said respondent Barton is a nephew of the complainant and during the greater part of his minority he was given a home with and supported by her. That their relations were intimate, substantially those of parent and child, and that said respondent Barton enjoyed her entire trust and confidence. That on account of her confidence in Barton and her own inability to transact business, she constituted him her agent for the management of said hotel business and in that capacity he acted for her at different periods, aggregating, some seven years, and that during the month of September, 1910, and for more than a year prior thereto, the said respondent Barton was still acting as her agent under the same conditions of trust and confidence, she accepting his advice

and believing that he would conduct the business solely with a desire of furthering her best interests, trusting him to enlighten her upon matters connected therewith.

The complainant avers, upon information and belief, that the "Vaill Cottages" during each of the seasons of 1909 and 1910, yielded a profit of about $1,000; that she has repeatedly requested an account thereof, with which request the respondent Barton has failed to comply, and that when he was discharged as agent on November 1, 1910, he left unsatisfied a large indebtedness incurred by him in the conduct of the business during those years.

That on or about November 7, 1910, the attention of the complainant was called to two instruments purporting to be mortgages covering her real and personal estate in said New Shoreham, executed by her, during the incumbency of said Barton as her agent, in favor of the respondent McPhail, securing the payment of $8,000; that the complainant is not and never has been indebted to said McPhail in the sum of $8,000 or in any other sum; that previous to November 7, 1910, she was not aware of the existence of said bond and mortgages and that she has no knowledge of having executed the same, but that if she did execute such instruments she did so unwittingly, at the request of the respondent Barton, who was acting as her confidential agent, and without any knowledge of their contents or purport, influenced by her confidence in Barton, believing that if he requested her to execute papers they must be proper papers for her to execute and that there was no necessity for inspection or understanding upon her part; that the complainant received no consideration for these instruments nor has she derived any benefit or advantage therefrom and if there was in fact any consideration it passed from the respondent McPhail to Barton and was for the sole benefit of the latter; that the respondent McPhail was, at the time when these instruments were executed, an intimate acquaintance of Barton and had full notice and knowledge of the facts regarding the consideration as well as the agency of the respondent Barton and the

incapacity of the complainant for transacting business; and that the complainant is informed and believes that the interest in said mortgages is overdue and that the said respondent McPhail is about to foreclose the same.

The respondents, in and by their answer, deny the inexperience and ignorance of the complainant in business affairs, her inability to attend to and understand the same and her failing health; they deny that the relations between complainant and Barton were confidential or other than those of principal and agent; they deny that the complainant had implicit trust and confidence in Barton, accepted his advice in all matters and trusted him alone to enlighten her, whenever proper, upon all matters connected with said hotel business; they deny that the "Vaill Cottages" for the seasons of 1909 and 1910 yielded a yearly profit of $1,000, or that the complainant has requested an account thereof or that the respondent Barton was discharged as agent on November 1, 1910, leaving a large indebtedness, etc.; they deny that the complainant is not now and never has been indebted to the respondent McPhail; that she was not aware of the existence of the instruments referred to and that she had no knowledge that she had executed them; they deny that the complainant executed said instruments unwittingly at the request of Barton; they deny that at the time said instruments were executed Barton was acting as complainant's confidential agent and that she executed said instruments without knowledge of their contents or purport and was influenced in so doing by her implicit trust and confidence in Barton; but on the contrary they aver that complainant executed the papers well knowing their contents; and that she well understood them at the time they were executed. They deny that said complainant received no consideration and derived no benefit or advantage therefrom and that said instruments were solely for the personal benefit of Barton; they deny that said respondent McPhail had full notice and knowledge of the facts alleged by the complainant regarding the consideration for said instruments and the agency of Barton

and that said respondent McPhail had knowledge of the incapacity of complainant for transacting business; and they deny that the respondent McPhail is about to foreclose said mortgages or exercise any power of sale contained therein.

The other allegations of the complainant's bill are admitted by the respondents and the respondents, further answering, set forth details of the various loans made by McPhail to Barton and the circumstances connected therewith. The respondent McPhail, more fully in behalf of himself, further answering, says his last loan to Barton of $1,000 was made upon the agreement of the complainant to execute said bond and mortgages and in consideration of the cancellation of a note of $7,000 upon which said complainant was guarantor; that said loan of $1,000 would not otherwise have been made by him; and that the said complainant assented to and requested the said respondent McPhail to carry out the transaction.

It appears that the complainant is the owner of a tract of land, with buildings thereon, on the south shore of Block Island, in the town of New Shoreham, where she has conducted since 1897, a summer hotel under the name of "Vaill Cottages;" that she is seventy-two years of age and unmarried; that the respondent Barton was her nephew and the son of a sister who died soon after his birth; that, upon the death of the mother, the complainant took the child and brought him up, their relations being substantially those of parent and child; that these relations having continued after Barton reached his majority, the complainant constituted him her agent in the care and management of her said hotel, and that he acted as her manager for periods aggregating some seven years.

It further appears that, during the time the respondent Barton was engaged as manager of the complainant's hotel business at Block Island, he was also the lessee and proprietor, at different times, of two hotels in the city of New York. Barton does not seem to have been a man of financial

resources and in order to carry on his hotel ventures in New York he was obliged to borrow money.

The respondent McPhail was an acquaintance and friend of Barton. The acquaintance between the two men seems to have originated through the one being the proprietor and the other a guest at one or both of the New York hotels. The respondent McPhail was a man of means and, from time to time, at the solicitation of Barton loaned him money, such loans having amounted, prior to the transactions complained of, to the sum of $7,000. In obtaining these funds, Barton invoked the help of his aunt, the complainant, who came to his assistance and at different times endorsed his notes. These notes were made by Barton, payable to the order of the respondent McPhail, who advanced the money.

At a later period, the respondent Barton, requiring further funds, again applied to the respondent McPhail, who informed him that he did not care to advance more money unless he could be secured for what he had already advanced, together with the further loan which Barton then required. Under these conditions, Barton communicated with his aunt, the complainant, who was then residing at Pelham Manor, requesting her presence in New York city for the purpose of executing some papers which would facilitate the loan. The complainant seems to have understood in advance that the purpose of her visit to New York was to render some financial aid to her nephew. It appears from her own testimony that on the way to and before reaching New York she had considered the matter and arrived at the conclusion that she might further safely obligate herself to the extent of $2,000. After reaching New York, the complainant met the respondent Barton and was taken by him to a notary public, where she met the respondent McPhail, and was shown a bond and two mortgages securing the same, one of which mortgages was upon her real estate and the other upon her personal property at Block Island. This bond covered the amount of the McPhail notes of $7,000 and a further advance of $1,000 which was then made, making a total of

$8,000. The bond and mortgages were executed by the complainant. She says that she had these papers in her hand for some time, although she did not read them. Upon the execution of these papers the respondent McPhail advanced $1,000 in cash to Barton and surrendered the note for $7,000 bearing the complainant's endorsement and it was destroyed.

The complainant claims in and by her bill that she has never been indebted to the respondent McPhail in the sum of $8,000 or any other sum; that prior to November 7, 1910, she was not aware of the existence of said instruments, and if she executed them she did so unwittingly, at the request of the respondent Barton, without knowledge of their contents, influenced wholly by her implicit trust and confidence in Barton upon whose representations she wholly relied; that she has no recollection that she acknowledged any papers at that time; that she received no consideration for said instrument, and if she executed said instrument, the consideration, if any, inured solely to the benefit of the respondent Barton; and that the respondent McPhail, at the time of the alleged execution of said instruments, had full notice of all the aforesaid facts regarding said consideration, the said agency of Barton, and the incapacity of the complainant for transacting business.

The case was tried in the Superior Court on the bill, answer, replication, and proofs and under agreed issues of fact, as follows:

"1. Was the complainant inexperienced in and incapable of personally conducting business affairs throughout the year 1910?

"2. Did a confidential relationship exist prior to and during the year 1910 between the complainant and the respondent Barton?

"3. Has the respondent Barton refused or failed to account for or pay to the complainant profits of the complainant's hotel business at Block Island, known as Vaill Cottages, accruing during the seasons of 1909 and 1910 if any are due?

"4. Did the complainant sign, seal, acknowledge and deliver the documents of which Exhibit A and Exhibit B annexed to the bill are copies?

"5. If so, did she do so knowingly, voluntarily and with knowledge of their contents and purport?

"6. If the said instruments were executed, why were they executed?

"7. If the said instruments were executed, was there consideration therefor, and if so, what was it?

"8. Did the respondent McPhail have knowledge of the relations existing between the complainant and the respondent Barton."

At the conclusion of the trial in the Superior Court, a decision was given orally from the bench granting the complainant's prayer for the cancellation of the bond and mortgages. The conclusions of the court, as appears from the record, were expressed in a dialogue between court and counsel, in which the following findings appear. That the complainant knew that she was signing a mortgage, although she might not have realized the full extent of the obligation; that she was a woman capable of understanding mortgages from previous experience and that she had opportunity to read the mortgages in question; that the respondent Mc-Phail was not acting in collusion, but on the contrary in the utmost good faith and should be acquitted of any bad faith in the matter; that he probably did the same as any business man would do; that McPhail had known the conditions between the complainant and Barton for a number of years; that he had known that Barton was the complainant's nephew and that he was the manager of her summer hotel and that she had been backing and endorsing Barton's notes for a number of years, and that that ought to have established in the mind of McPhail, an intelligent man, that a confidential relation existed between Barton and the complainant. Continuing, the court said: "But here is a proposition of law which I am inclined to think is perhaps correct, and that is to say that inasmuch as this mortgage was

practically a gift, at least a very much larger portion of it was of no benefit to the complainant in this case, whether or not with a mortgage of that kind made between people having the relationship of these people, the law does not require that you should show that she acted on independent advice in the matter. Pomeroy seems to state it that way. I am simply trying to look at it from a legal point of view and the rules laid down by equity, to ascertain whether or not, even according to the testimony, whether or not there isn't a requisite there which you (the respondents) did not comply with. I do feel that the relationship is established here, and that he, the respondent McPhail, had full knowledge of it, and that he was bound by the same requisites that the nephew would have been in a similar transaction. Therefore it does not appear that this woman under the circumstances had the advice which she should have had before entering into any such transaction, and that being so, I feel compelled to grant the prayer of the bill."

It is apparent from the language employed that the Superior Court found nothing more than a technical case of constructive fraud.

Before proceeding to a discussion of the grounds upon which the complainant claims that this bond and these mortgages should be cancelled, it may be profitable to notice, briefly, how far, or to what extent, the transactions now complained of changed or increased the complainant's liability. It is undisputed that the complainant had, from time to time, endorsed notes at the solicitation and for the accommodation of her nephew Barton, and it is not claimed that such endorsements were procured through any solicitation or even upon any suggestion of McPhail. Prior to the transactions which are the subject of this bill of complaint, the complainant was already obligated, through her endorsements upon notes held by McPhail, to the amount of $7,000 and, therefore, the bond and mortgages now complained of merely changed the obligation of the complainant from endorsements to a mortgage, and added the amount of $1,000

then advanced. The complainant, being already obligated to the extent of $7,000, gave to the respondent McPhail mortgages securing her bond and in consequence thereof obtained the surrender of the note upon which she was endorser and a further advance of $1,000 to her nephew. While the form of the obligation was changed from endorsement to bond and mortgages, the difference in the amount of the obligation was only $1,000.

The complainant starts out with the assertion that at the time this bond and these mortgages were executed she was old and inexperienced in business; that Barton was her business agent; and that a fiduciary and confidential relation existed between them. The complainant was an educated and intelligent woman. She had, during her life, so far as appears, managed her own affairs except so far as she had the assistance of Barton for several years in the running of the summer hotel at Block Island. Barton was not connected with that hotel during the whole period of its existence, but only a portion thereof, and even during the incumbency of Barton, as manager, she was generally on the premises ready and expecting to be consulted and to give advice upon any matter of importance that might arise in the conduct of the business. So far as the summer hotel is concerned it does not appear that Barton was anything more than a salaried manager. The methods employed in the conduct of the business were doubtless somewhat loose, but the character of the services rendered by Barton were those of a hotel manager or head clerk. Aside from the services rendered by Barton at the Block Island hotel, it does not appear that he ever rendered her any assistance in any other capacity whatever or that she had ever consulted or relied upon him as an advisor in the transaction of any other business. The record, in our opinion, fails to furnish satisfactory evidence of the existence of those fiduciary and confidential relations which would be necessary to taint the transactions between these parties with fraud.

The bond and the mortgages were undoubtedly given for the benefit of Barton and the incurring of that obligation was doubtless detrimental to the complainant in the same way as every assurance of another's debt is detrimental to the party who may guarantee the same.

There is nothing in the testimony tending to show that McPhail solicited the complainant to make the bond and mortgages. He did tell Barton that he could not let him have any more money without security for past and future loans, but he does not appear to have said anything to Barton requiring the complainant to furnish such security, or to have urged the complainant to become a party to the transaction. So far as the testimony goes, the arrangement for the security was made with the complainant by Barton without the presence or assistance of McPhail. It is doubtless true that McPhail knew the relations between the complainant and Barton so far as the same were disclosed to him. He knew that Barton was her nephew and that practically he stood in the relation to her of a son. He knew that the complainant had employed Barton for several summers as manager of her hotel at Block Island and he also knew that the complainant assisted Barton in raising money for the requirements of the latter's business. McPhail had also been a guest at the summer hotel and had been able to observe that the conduct of its affairs had not been entirely left to Barton, but that the complainant, herself, exercised some general supervision.

The controlling question in this case seems to be whether or not the complainant, in the execution of the bond and mortgages referred to, sufficiently understood the purpose of those instruments and the nature of the obligation which she thereby assumed. If she did understand the nature of the obligation that she was incurring, the advice of a third party would be unnecessary and the respondents would be under no obligation in that regard. The function of independent advice is not to warn or dissuade the party to whom it is given from an improvident transaction or from one

that may be unwise viewed from a business standpoint. It is only required to bring to the mind of the party to whom the transaction might prove to be a disadvantage a knowledge of the act about to be performed, such knowledge as would amount to a fair understanding of the consequences which might arise.

In 2 Pomeroy's Eq. Juris., 3rd Ed., Sec. 928, the law is stated as follows: "The fact that a conveyance or other transaction was made without professional advice or con-(2) sultation with friends, and was improvident, if not coupled with an inadequacy of price, is not in itself a sufficient ground for relief, provided that the parties were both able to judge and act independently, and did act upon equal terms, and fully understood the nature of the transaction, and there was no undue influence or circumstances of oppression."

In *Harrison* v. *Guest*, 6 DeGex, M. & G. 424, "an old man of seventy-one, bedridden and illiterate, without any independent professional advice, and without consulting his friends or relatives, conveyed property worth four hundred pounds, for the consideration of being provided with board and lodging during the rest of his life. He lived only six weeks after the conveyance; his representatives sought to have the conveyance set aside. The evidence shows that he had refused to employ professional advice for himself, that he was able to understand the nature of the transaction, and that there were no circumstances of oppression; the court held that there was not sufficient grounds to impeach the conveyance."

In *Green* v. *Thompson*, 2 Iredell's Eq. N. C. 365, it was held that, "A court will not annul dispositions of property, because they are improvident, or such as a wise man would not have made or a man of nice honor consented to receive; but all the contracts of an individual, even his gratuitous acts, if formally executed and no power of revocation reserved, are binding, unless they can be avoided because of surprise, or mistake, want of freedom, undue influence, the suggestion of a falsehood or the suppression of truth."

In the case of *Blackie* v. *Clark*, 15 Beav. 595, "A married woman, having separate estate, joined with her trustee, who was her confidential medical attendant, in granting annuities secured on her separate estate for his benefit. She afterwards sought to set them aside as against the grantees: *Held*, that the onus of proving their invalidity was on her; and it appearing that she understood the transaction, and no undue persuasion or coercion having been proved, it was held, that they could not be impeached.

In *Juzan* v. *Toulmin*, 9 Ala. 662, it was held that, "A contract made by a man of fair understanding, would not be set aside merely because it was a rash, improvident or hard bargain; yet if made with a person of imbecile mind, the inference is, that it was obtained by circumlocution or undue influence, so as to throw upon the other party the onus of showing its fairness."

Now, in the present case, did the complainant require the advice of a third party or did she understand the extent and nature of the obligation which she assumed in executing the bond and mortgages referred to?

It seems to us the testimony of the complainant clearly shows that she fully understood the situation and the nature of her obligation under said bond and mortgages. She testified as follows: "C. Q. 199. Do you know what a mortgage is? A. Oh! I have a sort of an idea that it is—I have some idea what it is, yes. C. Q. 200. What is your idea of a mortgage Miss Vaill? A. To bind yourself to pay a certain amount of money on a certain piece of property, on which you must pay an interest. C. Q. 282. Then you have at times endorsed notes for Mr. Barton? A. Yes, sir. C. Q. 283. How many notes have you ever endorsed for Mr. Barton would you say? A. Two I think. C. Q. 286. Did he make a note and have you sign on the back of it,—endorse it? A. I signed it somewhere. I knew it was to help him. C. Q. 288. When you endorsed this note for Mr. Barton that the Commercial Trust Co. collected, did you know what you were doing? A. I think I did. C. Q.

289. Were you raising money to help Mr. Barton? A. I was helping him. He said I should never have to pay it, he should pay it. C. Q. 290. When you put your name upon that note did you know you were assuming a legal obligation? A. Yes, sir. C. Q. 291. You knew that you were holding yourself liable to the payment of that note in case he didn't pay it? A. Yes, sir. C. Q. 292. And if you signed any other note of a like nature you would know the same thing? A. Yes, sir. C. Q. 293. And if you signed a mortgage did you realize what that would mean? A. I think so. C. Q. 294. You knew that when you did sign a mortgage that you were pledging your property to secure the payment of that note? A. Yes, sir. C. Q. 295. And you have always known that Miss Vaill since you have known anything about business? A. Yes, I think so. C. Q. 300. Do you remember of making any such statement as what I have just read, namely this: ' I had an impression that it might be that he wanted something about $2,000.00 and I had that in mind; I don't know how I got it that he wanted to have $2,000.00, and I thought I could afford to give him that mortgage, and that he would look out to see that it was all right.' Did you make that statement in New York? A. It sounds as if I may have made it. C. Q. 310. It is true? A. Yes; I did have that impression in my mind that he might want $2,000.00 and I could afford to give it to him if he assured me that it would be all right and he would pay it. C. Q. 311. Then you did have in mind giving a mortgage for the benefit of Mr. Barton? A. Yes, sir."

In connection with this testimony, it should be borne in mind that the complainant on the day when these papers were executed went to New York at the request of the respondent Barton, her nephew. She evidently understood in advance the purpose of her visit to New York for, on the way there, before she had met either of the respondents, she understood that her nephew might be in need of money and she was considering how far, or to what amount, she could go in further assisting him. Before she arrived in New York

she had reached the conclusion that she could assist him to the amount of $2,000. This sum, as it turned out, was double the amount which the respondent Barton then required.

The relations between the complainant and the respondent Barton were not of that general and intimate character which would of themselves necessarily raise a suspicion of fraud in the transactions between her and the respondents. It does not appear that the complainant relied upon the respondent Barton for anything in the transaction of her general affairs, but that she simply employed him as the active manager of her summer hotel over which she retained a general authority. She testified that she employed the respondent Barton as a manager and gave him entire authority, but *expected to know of anything special that was done and to approve it.* That the complainant exercised a supervision of the hotel business is not only admitted by her, but is also shown in the testimony of two of her witnesses, Horatio C. King and Catherine V. Howard, and was apparent to the respondent McPhail who, for a time, was a guest at the hotel.

We do not think that the testimony established such a fiduciary and confidential relation between the complainant and the respondent Barton as that contemplated and required by the general principle of equity that a purchase by a trustee or party holding any fiduciary relation to the trust property or subject is voidable at the pleasure of the *cestui que trust*, although the purchasers paid an adequate price and gained no advantage. See *Curlett* v. *Newman*, 30 W. Va. 182; *Ralston* v. *Turpin*, 25 Fed. 7; *Soberanes* v. *Soberanes*, 97 Cal. 140; *Muir* v. *Miller*, 72 Iowa, 585; *Teegarden* v. *Lewis*, 145 Ind. 98; 1 Jones on the Law of Real Property in Conveyancing, Sec. 109; *Saufley* v. *Jackson*, 16 Tex. 579; 1 Bigelow on the Law of Fraud, 357.

The relation between the complainant and the respondent Barton must have a somewhat important bearing on the transactions which are now complained of. Barton was not only her nephew, a blood relation, but was practically her son.

Transactions between a parent and child or between other near relatives may be carried on under such circumstances as to remove all suspicion of fraud. This would especially be so if the one obtaining the benefit is a person who would naturally be the recipient of the other's bounty. *Shepherd* v. *Bevin*, 9 Gill 32, 39; *Hays* v. *Hollis*, 8 Gill 357; *Haines* v. *Haines*, 6 Md. 435; *White* v. *Thompson*, 1 Dev. & B. Eq. 493; *Fripp* v. *Fripp*, 1 Rice Eq. 84.

(3) Upon a full consideration of the whole case and authorities cited by both parties thereto, we think that the complainant fully understood the nature and effect of the obligation incurred by the execution of the bond and mortgages and that she did not execute those papers through any undue influence exerted upon her by either of the respondents, but on the contrary, out of affection and regard for her nephew, she was willing to and desirous of assisting him in raising money. So far as the respondent McPhail is concerned, he does not appear to have exercised any influence over the complainant in obtaining the bond and mortgages which, at best, only slightly increased the obligation of the complainant to him.

The decree of the Superior Court is reversed and the case is remanded to that court with direction to dismiss the bill with costs.

*William A. Spicer, Jr., Edwards & Angell,* for complainant.
*Horatio C. King,* of counsel.
*Irving Champlin, Richardson & Hammill,* for respondents.