225 A.2d 778.

HOWARD L. APOLLONIO *vs.* LAWRENCE W. KENYON, *Executor of the Will of Valecia L. Apollonio.*

JANUARY 24, 1967.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This is an appeal from a decree of the probate court of the town of Hopkinton admitting to probate a written instrument dated June 22, 1961, purporting

to be the last will and testament of Valecia L. Apollonio
who died sometime in April 1962, but whose body was not
discovered until May 3, 1962. After a trial in the superior
court, the jury returned a verdict in which they found that
the instrument of June 22, 1961 was not her last will and
testament.

The cause is before us on proponent's exceptions to cer-
tain rulings made before and during the trial and to the
denial of his motion for a new trial.

First we should identify proponent who has appealed
this cause to us. Lawrence W. Kenyon, the sole beneficiary
under the provisions of the alleged will, is the clerk of the
probate court of the town of Hopkinton. He is also the
town clerk. In Hopkinton the town council acts as the
probate court. In this case, however, upon the request
duly made by Howard L. Apollonio to the town council
in its capacity as the probate court, James O. Watts, an
experienced member of our bar, was appointed as the
acting probate judge to hear Kenyon's petition to admit
to probate the instrument which is the subject of this
litigation.

While it would serve no purpose to set forth in detail
the voluminous testimony elicited in the trial below, cer-
tain salient facts are recited so that one may gain a better
perspective as to the testamentary trials and tribulations
of the testatrix, Valecia.

The record shows that Valecia in the final seven years
of her life executed four wills. The first was on January 4,
1955, when she and her husband, Donald L. Apollonio,
executed wills. Valecia made two small bequests to chari-
table organizations whose prime functions were the care
and shelter of animals, and then left the residue to her
husband. If her husband predeceased her, Valecia's estate
was to go to the secretary of the attorney who drew both
wills. While the dispositions in each will are substantially
the same, Donald designated the attorney to be his executor

while Valecia's will called for her husband to act as her executor, and if he were not living then the attorney was to administer her estate. The secretary was described in Donald's will as a friend of his family.

Donald died in New York City on November 6, 1959. Upon being notified of her husband's death, Valecia began immediate preparations to go to New York so that she could identify and claim the body. She was unable to contact her attorney and thereupon engaged the services of another attorney whose offices were in Westerly, a town adjacent to Hopkinton, and together with him and a neighbor she set forth on her sad journey.

Being piqued at the inability to locate her original lawyer, Valecia upon her return to Rhode Island sent him a letter dated November 7, 1959 in which she stated that his services would no longer be required and that the Westerly attorney was to represent her. The record shows, however, that on December 9, 1959, Valecia executed the necessary documents to probate her husband's will. Her original attorney thereupon commenced his duties as the executor. The proponent here was also appointed appraiser of Donald's estate.

On December 21, 1959, Valecia executed another will. By its terms she left all her property to her Westerly attorney, and in the event he died before her the estate was to go to the attorney's wife. Valecia had also conveyed her real estate to the attorney. This deed was not recorded.

During this time, however, it appears that Valecia's displeasure with her original attorney, who was now acting as executor of Donald's estate, had ceased because the attorney began a series of conferences and negotiations with the Westerly attorney whereby the second will was destroyed, the unrecorded deed returned and a formal instrument revoking the December 21st will was executed by Valecia. Certain items of personal property which the

testatrix had given to her second attorney were returned to her.

On July 22, 1960, Valecia executed a general power of attorney wherein she gave her original attorney complete management of her affairs. Subsequently, however, she once again became dissatisfied with his handling of her affairs and particularly his administration of her husband's estate. She thereupon contacted an attorney in Providence and in November 1960 there began another series of conferences and correspondence with the original attorney on one side and Valecia and her new counsel on the other. To protect his new client's interest the Providence lawyer entered his appearance in her behalf in the Hopkinton probate court. The proponent acknowledged that as probate clerk he received the entry of appearance and filed it with the records in the estate of Donald Apollonio. However, on December 3, 1960 Valecia wrote to the Providence attorney and informed him that she had examined the records of her original attorney and found everything in order and to her satisfaction. She celebrated this particular occasion by composing a poem entitled "My Friend" and dedicated it to her first attorney. This poem is one of several authored by Valecia and made part of the record below.

On February 16, 1961, Valecia signed a waiver of notice of a hearing on the executor's first and final account on her husband's estate. This account was then presented to Kenyon in his capacity as probate clerk for an immediate hearing before the town council acting as the probate court. After consulting with the town solicitor, Kenyon declined to place it on the docket having been advised by the solicitor that the Providence attorney should be notified of the filing of the account and given an opportunity to examine its contents before any action would be taken on it.

Her poetical protestations of "friendship" towards her original attorney to the contrary notwithstanding, Valecia

on March 13, 1961 executed another instrument which authorized the Providence attorney to represent her. This was approximately one month after she had signed the waiver in connection with the first and final account of her husband's estate.

It was during this period of the year that Valecia executed her third will. Although this will was not in evidence, the testimony disclosed that her estate was left equally between her Providence attorney and Kenyon. The record shows that at this time she had been going to the town hall to consult with proponent.

On May 1, 1961, the account of the executor of her husband's estate was approved by the probate court whereupon the original attorney delivered to the Providence attorney all documents, securities and bankbooks he had in his possession, receiving a duly executed receipt for these items.

A statement wherein Valecia's Providence counsel acknowledged that he had examined the executor's account and found it in order was filed in the probate court.

Thereafter, the securities formerly in the names of Donald and Valecia as joint tenants, but now in her name alone, and a bankbook showing $10,700 on deposit were delivered to the Providence attorney. These items remained in the attorney's possession until sometime after the testatrix' death. Valecia in turn had given certain documents and records to Kenyon who stored them in the vault in the town hall. Among these were statements by her Providence attorney of dividends he received in her behalf and which he had deposited in a checking account. Valecia, however, was unable to obtain the bankbook which was being retained by the attorney in Providence. During her visits to the town hall, Valecia told Kenyon of her disenchantment with her lawyer. She told the town clerk that she wanted to draw a will but was afraid of lawyers.

On June 22, 1961, Kenyon called his town solicitor whose office was in Westerly to determine if he would see Valecia.

She was informed that the solicitor would see her that night at 7 p.m. at his home which is in Hopkinton. The testatrix asked Kenyon to meet her there because of her expressed fear of attorneys.

The solicitor testified that Valecia was punctual; that he inquired as to her dispositive intent; that when she told him she wanted to leave everything to Kenyon, he had her execute in her own handwriting a signed statement which said "I want Mr. Lawrence Kenyon to have all I posess [sic] at the time of my death"; and that he then called in his wife who is also his secretary and she typed the will. The draftsman also stated that the will provided that the estate was to go to Mrs. Kenyon in the event her husband predeceased the testatrix. Kenyon was then designated as the executor. The preparation and execution of this instrument took about a half hour. The Kenyons arrived at the attorney's home at 7:30, and after the will had been executed joined Valecia in the solicitor's front room which he uses as an office. Upon leaving the house, Valecia gave the will to Kenyon and stated: "It's all yours." Kenyon took the will to his home and secreted it there for purposes of safekeeping.

On the next day, to wit, June 23, 1961, Valecia went to the Westerly branch of the bank wherein her savings were kept, executed a false affidavit in which she stated that her bankbook was lost, and applied for a new book. This bankbook was in fact in the possession of her Providence attorney. The bankbook application was duly advertised and on July 24, 1961, a new bankbook was issued. One week later she withdrew the entire account of over $10,700 in cash and put it in her bag and left the bank. While no one can account for the entire disposition of this money, over $6,000 was given to an out-of-state funeral director to provide perpetual care for the graves of her late husband and herself and $1,000 was expended by Valecia for medical services when she was hospitalized in New York for surgery.

In April 1962 Valecia mailed a note to Kenyon in which she stated she was taking a trip and asked him to pay the enclosed electric bill. On May 3, 1962, the state police entered Valecia's home and found her dead. The medical examiner testified that she had been dead for about four weeks. The cause of death was given as self-inflicted barbiturate poisoning.

On this same day, Kenyon filed a sworn petition for probate of the instrument of June 22, 1961, as the last will and testament of Valecia Apollonio. In his petition he made affidavit that there were "No known relatives or heirs." The filing of the petition was duly advertised and after extensive hearings in the probate and superior courts this case is before us.

The first three exceptions of proponent were taken to certain preliminary rulings made by the superior court before the commencement of the trial of this cause. The first two execptions we consider are to the successive denials of proponent's petition wherein he sought to have the court receive evidence to determine if Howard Apollonio was a "party in interest." The first denial occurred on March 28, 1963, over a year before the trial. On June 19, 1964, after the jury had been impanelled but in their absence, this petition was reconsidered by the trial justice on the basis that the original denial was made without prejudice to proponent's right to renew it. In his brief proponent now describes this petition as one to determine if Howard was an "aggrieved party." An examination, however, of the petition, proponent's second exception and his reliance on the case of *Spooner* v. *Tucker*, 78 R. I. 329, makes it clear that proponent was attempting to have evidence produced to show Howard was a party in interest. We also point out that in the statute governing a probate appeal the term used is "person aggrieved" and not an "aggrieved party." Though this is a technical difference, we will use the statutory language. The terms "party in interest" and "person ag-

grieved" as they are used in the pertinent statutes are not interchangeable. This fact is clear when one reads further on in this opinion. We will, therefore, treat proponent's first two exceptions as being to the denial of his petition that evidence be produced to show Howard as a party in interest.

Immediately following the second denial of proponent's petition, the court heard certain evidence and thereupon granted the motion of Norman L. Apollonio and Mary L. Smith that they be made parties contestants. The proponent duly excepted to this ruling. We will now consider these three exceptions together.

Howard and Norman Apollonio are brothers of Valecia's deceased husband Donald, while Mary is his half sister. The statutory provision upon which they rely in claiming an interest in this estate is G. L. 1956, §33-1-3, which is a portion of our law on descent and distribution. By its terms it provides that, as in this case, where no children or paternal or maternal kindred survive the widow, then the brothers and sisters of her deceased spouse shall take.

In alleging error in the denial of his petition to determine whether Howard is a party in interest, proponent states that the issue to be considered in this petition is not whether Howard can prove an interest in the estate but "whether or not the decedent died without heirs or next of kin." He argues in effect that before Howard or for that matter the other contestants can participate in these proceedings, they must establish that the decedent died without heirs-at-law or next of kin.

This contention is without merit. The proponent overlooks and misconceives our holdings not only in *Spooner* v. *Tucker, supra,* but also in the second phase of this case found in *Spooner* v. *Tucker,* 86 R. I. 266. In both cases we pointed out it is not a condition precedent that a person, before either prosecuting an appeal from a decree admitting a will to probate or being allowed to intervene in an already

pending appeal, prove that he would inherit or otherwise be entitled to share in the estate if the decree appealed from was reversed. It is sufficient, we said, if such a person shows that in the circumstances that existed with reference to the estate he could have presented a justiciable question as to his right to share in the deceased's estate.

So far as Howard is concerned and proponent's petition, the posture of the instant cause is completely different from that of the first *Spooner* case.

There we were concerned with a motion that certain individuals be added to a probate appeal as parties appellants.

The motion in that case was made pursuant to the provisions of §33-23-8, which provides that when a probate appeal is entered in the superior court, "the superior court at any time during the pendency of the appeal * * * upon motion, may permit *any interested party* to enter an appearance." (italics ours) In construing this particular statute we held that unless the interest of the movant is disclosed by a sworn petition or motion, evidence should be received to show the requisite interest. We remanded the case to the superior court so that the moving parties could adduce such evidence as they desired.

Here, however, Howard Apollonio is not before the court attempting to intervene as an interested party. He was a participant in the proceedings before the Hopkinton probate court and as such his status is governed not by §33-23-8 but by §33-23-1 which states: "*Any person aggrieved* by an order or decree of a court of probate may * * * appeal therefrom to the superior court * * *." (italics ours) The first *Spooner* case, therefore, is not applicable to Howard's status. Here Howard in his reasons of appeal has alleged that his interest in this estate is by virtue of the provisions of §33-1-3. Howard Apollonio was properly before the superior court and proponent's petition was correctly denied.

The holding of the second Spooner case, to wit, *Spooner v. Tucker,* 86 R. I. 266, is dispositive of proponent's exception to the granting of the motion of Norman Apollonio and Mary Smith that they be added to the appeal as parties contestants. There we said that the purpose of §33-23-8 was to aid the court in the promotion of justice in cases involving the settlement of estates by empowering it to add as parties persons whose interest in an estate is belatedly ascertained as well as those who, because of an interest in an estate, should be made subject to the judgment of the court in order to expedite and terminate such litigation.

A person seeking to take advantage of this statute either as a proponent or a contestant must establish that he has an interest in the estate and that he is aggrieved by the decree. This burden was upon Norman Apollonio and Mary Smith.

In this case all contestants allege they share in Valecia's estate pursuant to the terms of §33-1-3 as brothers and a half sister of Donald, the deceased husband of the testatrix. We pointed out in the second *Spooner* case that to prevail on such a motion as we have here to be added as a party contestant, it is not necessary for the movant to prove that intestacy would result from a failure of the will in probate. If it can be shown that *should* intestacy result by reason of the failure of the present will, Norman Apollonio and Mary Smith would have a justiciable claim of right to share in the estate they have proved that they have an interest therein. If the decree of the probate court admitting the will to probate operates adversely on that interest, they are "persons aggrieved" therein.

Here evidence was presented by Howard Apollonio as to the relationship between him, Norman Apollonio, Mary Smith and Valecia's deceased husband. Testimony was given that the testatrix had no living relatives nor had she ever given birth to any children. This together with the

sworn petition for the probate of the June 22, 1961 instrument wherein Kenyon under oath stated that the testatrix died without known relatives or heirs constituted sufficient evidence upon which the trial justice properly added Norman and Mary as parties contestants.

It is our opinion that the rule of both *Spooner* cases has been amply satisfied and that the denials of proponent's petition and the granting of the motion to permit the addition of the parties contestants, all of which was done prior to the actual trial of the instant cause, were correct. The proponent's first three exceptions are overruled.

The proponent lists in his brief 40 exceptions taken, he states, to certain evidentiary rulings made at various times during the 15 days consumed in the course of the trial. He alleges that the individual rulings in and of themselves may have been harmless but that they had a cumulative effect of prejudicing his cause with the jury. A similar contention was made and rejected in *Talon* v. *Jackson*, 68 R. I. 488. Our examination of the over 1400 pages of testimony presented in this cause, however, shows that some of the alleged exceptions cannot be found in the transcript while certain others cited as being taken by proponent were actually taken by contestants to rulings made in favor of proponent. We have examined the remaining rulings in question and we are of the opinion that whether considered singularly or together no reversible error was committed therein by the trial justice.

The bulk of proponent's brief and argument before us refers to his exception to the refusal of the trial justice to grant his motion for a new trial, which is based on the usual grounds and substantially contends that the verdict is against the evidence, the weight thereof, the law and the evidence. The proponent did not take any exception to the charge to the jury as given by the trial justice and in accordance with our long-standing rule the charge as such became the law of the case. *Roland Bileau Transportation Co.* v.

*Lodie Brien, Inc.,* 100 R. I. 723, 219 A.2d 401. The case was submitted to the jury on the issue of due execution of the will, testamentary capacity and undue influence.

The jury was instructed that, on the issues of proper execution of the purported will and the testamentary capacity of Valecia, the burden of proof was upon proponent.

On the issue of undue influence, the trial justice instructed the jury that if they found that on June 22, 1961, proponent stood in a relationship of trust and confidence to the testatrix, in other words that she sought his advice and he gave it and she relied upon it, and if they also found that Kenyon entered into the drawing of the will in any detail other than merely making an appointment for the decedent to see the town solicitor, then the burden of proof was upon proponent to prove by the fair preponderance of the evidence that the will was not produced by undue influence on his part. The trial justice then told the jury that if they found that either the relationship of trust and confidence did not exist or that Kenyon had nothing to do with the procuring of the will other than making the appointment, then the burden of proof on the issue of undue influence was upon contestants.

The proponent did not ask for any special findings, and since the verdict reached is a general one he finds himself in the position where the jury could have believed that he had not sustained his burden either on the issue of testamentary capacity or undue influence or both.

While it is conceded that the will was duly executed, proponent in pressing his exception to the denial of his motion for a new trial states that there was no evidence produced to show either the lack of testamentary capacity or that he exercised undue influence upon the testatrix. We cannot agree with this contention. Since the jury returned a general verdict, it is necessary that we refer to a portion of the pertinent evidence in the record on both of these two particular issues.

Upon the issue of testamentary capacity the record is replete with testimony which, if believed, well warranted the verdict. In *McSoley* v. *McSoley*, 91 R. I. 61, we stated the burden was on the proponent who must show:

"* * * that decedent had sufficient mind and memory to understand the nature of the business he was engaged in when he executed his will * * *; that he had a recollection of the property he wished to dispose of thereby; and that he knew and recalled the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their necessities, and the manner in which he wished to distribute his property among them."

Here the attorney who drew the will and his wife testified that they had never met the testatrix either before or after the evening of June 22, 1961. The attorney's wife based her opinion upon the fifteen-minute period she was in the company of Valecia. During this time the wife was typing the instrument which was to be signed by Valecia. Her husband's testimony on the issue of testamentary capacity was based on the period he spent with Valecia that evening. He estimated its duration to be between one-half to three-quarters of an hour. Within this period he left Valecia and went into an adjoining room to greet Mr. and Mrs. Kenyon.

The other witnesses who testified in support of Valecia's testamentary capacity were proponent and the Westerly attorney who was the beneficiary under Valecia's second will which she subsequently revoked. While proponent's interest in the outcome of the trial was apparent, the attorney's testimony was limited to the two months wherein he performed services for the decedent—November and December 1959. This, however, was about a year and a half prior to the execution of the instrument under consideration.

On the other hand the evidence produced to show the lack of testamentary capacity was substantial. In *Mc-*

*Soley* v. *McSoley, supra,* we reiterated the well-settled rule that a lay witness may express an opinion as to the testator's mental condition. Valecia's neighbor, her veterinarian, her original attorney and a physician who had treated her for a period of close to thirty years all testified in this regard. They gave a graphic portrayal of the physical and mental deterioration of Valecia particularly after the death of her husband in November 1959.

Their testimony described an individual who lived alone for the greater part of her married life, her husband being a mariner was away on the high seas. At various times she described herself to these people as a ballet dancer, ice skater, circus performer and a dressmaker. There was no evidence that she had ever been engaged in any of these occupations and her physician described Valecia's description of herself as flights of fantasy. Her delusions that her neighbors were persecuting her were described in detail. Her first attorney told of the numerous and groundless complaints Valecia gave him that the neighbors were out to injure her. The proponent substantiated this and also told of Valecia's complaining to him that a neighbor had stuffed her chimney in an attempt to suffocate her. Her chimney had an obstruction but it was a pair of dead birds that had fallen into the flue.

Doctor Martin O. Kaplan, a veterinarian with offices in South Kingstown, told the jury of his acquaintance with Valecia for a period beginning in 1957 and continuing up until April 1962. He described her affection for animals and the many times she brought her dog to his office. He estimated that he saw the testatrix over 100 times between 1959 and 1962. He pictured the physical and mental breakdown of this woman. He stated unequivocally that she was not of sound mind on June 22, 1961; and that she had no idea what a will was or the nature of her property, nor was she aware of the natural objects of her bounty. Although her entire estate, real and personal, is estimated to be in

the vicinity of $50,000, Dr. Kaplan told of Valecia's repeated statements that she was destitute and had no funds or money. He said she looked upon the stock she owned as mere pieces of paper. He pictured how Valecia's appearance became slovenly, her hair and clothes unkempt, and the rather peculiar type of attire she wore particularly after Donald's death. He pointed out that she had paid $6,500 in the summer of 1961 for the perpetual care of the graves of her husband and herself. There was prior testimony that this lot had already been committed to perpetual care.

Valecia's original attorney related that in March 1961 he offered her one of her bankbooks which he had in his possession. She refused it and told him: "I do not know what I am doing." This attorney also testified that in May 1961, when his account as executor was being approved by the Hopkinton probate court, he told the court of Valecia's mental condition and her incipient suicidal tendencies and suggested that a conservator be appointed. This statement, he said, was made in the presence of Kenyon and the town solicitor. They, however, testified that they had no recollection of this.

Suffice it to say that there was ample evidence presented to the jury for its consideration as to the lack of Valecia's testamentary capacity.

When we focus our attention on the issue of undue influence, it is well established that our decisions on this question have recognized the difficulty of proof of this ground in a contest of a will and we have stated that those exerting such influence do it secretly and in such a manner that as a consequence proof of the existence of undue influence must often be proven by circumstantial evidence. *Smith* v. *Smith*, 54 R. I. 402. Facts and inferences which when considered singly are of slight and different degrees of evidentiary weight may often, when considered in combination, properly be held to furnish sufficient proof of

594

undue influence. *Huebel* v. *Baldwin*, 45 R. I. 40; *Goff* v. *Clinton*, 53 R. I. 70; *Marsh* v. *Rhode Island Hospital Trust Co.*, 67 R. I. 229; *Brousseau* v. *Messier*, 79 R. I. 106.

Here, however, if the jury found that there was a relationship of confidence and trust between proponent and Valecia and if proponent did anything to procure the execution of the will other than call the town solicitor for an appointment, then the burden was upon him to show that the will was not procured by undue influence.

When we consider the issue of undue influence, the record contains the testimony by several witnesses that Valecia was susceptible to the influence of others. Doctor Kaplan stated that the goal of regaining the bankbook from her Providence attorney became a "burning issue" with the testatrix; that she offered to give him everything if he would assist her in obtaining the bankbook; and that Valecia had told him Kenyon had offered to obtain the book for her but that she knew what Kenyon was after and he was not going to get it.

The doctor described in a frank and direct manner how he drove Valecia to an attorney's office in Wakefield, Rhode Island, so that she could obtain legal assistance to aid her in her quest for the bankbook. He remained with her at the lawyer's office to assuage her fear of, what was now, the entire profession. Unfortunately the attorney could not keep the appointment and they left without seeing him.

The jury was justified in weighing this testimony with that of Kenyon's which was at times contradictory, evasive and qualified. Although Kenyon knew of the testatrix' fear of lawyers and knew she was to be at the solicitor's house at 7 p.m., he did not arrive there until 7:30 p.m. While at one point in his testimony he stated that the evening appointment was made at Valecia's insistence, he later said she did not care at what time the appointment was made. He said that Valecia drove by herself to the solicitor's

home. Other witnesses testified that the deceased did not drive at night because of her defective eyesight.

Kenyon admitted that the testatrix had confidence in him and relied on his advice. He assured the court, however, that he did not give legal advice. He attributed Valecia's coming to him because of the confidence and trust she placed in him.

While Kenyon attempted to limit his participation in the procuring of the execution of this purported will strictly to the making of the appointment for Valecia to see the town solicitor, the jury could have well inferred otherwise. During this time when the appointment was made, Kenyon knew Valecia was being represented by her Providence attorney. As probate clerk he had filed the attorney's entry of appearance for the testatrix in her husband's estate. He had stored in the town vault dividend income and bank deposit statements which had been forwarded to her by this attorney. The evidence showed that the town solicitor had acted on previous occasions as proponent's personal attorney as well as for other members of his family. Kenyon, however, did not inform Valecia of this fact.

Although Kenyon denied making any offer to aid Valecia in obtaining her bankbook, the record shows that on June 23, 1961, the day after she signed the purported will, she went to the Westerly branch of the Providence bank where her money was on deposit and there executed the false affidavit relative to her "lost" bankbook. This was a startling performance by a woman who heretofore lacked even a rudimentary knowledge about one's everyday business affairs.

While Kenyon would have liked the jury to believe that Valecia executed the will because of his kindness and friendship towards her, the hospital record of Valecia's surgery in the fall of 1961 showed that, when asked to list on the record a relative or friend, she gave the name of her undertaker. This, coupled with the fact that the social contact

between the Kenyons and Valecia were minimal with no exchange of greetings at Christmas or other holidays, constituted evidence for the jury's consideration as to whether the instrument of June 22, 1961 was in fact the result of Kenyon's kindness to her or due to the imposition of his will upon Valecia's free will and choice.

It is clear that the evidence and the inferences flowing therefrom on the issue of undue influence warranted the jury in finding that there did exist a relationship of trust and confidence between the proponent and the testatrix and that his activity in obtaining the execution of the purported will went beyond the mere making of the appointment so Valecia could meet the town solicitor. The burden therefore under the charge was upon proponent to show that there was no undue influence exercised by him. From the record the jury could properly have determined that proponent had failed in this regard.

In challenging the validity of the denial of his motion for a new trial proponent alleges that the trial justice overlooked, misconceived and misquoted relevant and material evidence. From a consideration of the rescript filed in this case it is clear to us that the trial justice has performed his duty in this regard in full compliance with the mandate of this court as laid down in its countless decisions on the function of a trial justice in considering a motion for a new trial.

After a thorough examination of the entire record, we are well satisfied that the trial justice did not err in passing upon proponent's motion for a new trial. Although he stated that Valecia executed all four of her wills after the death of her husband, when in fact the first will was executed while Donald was still alive, this statement is a mere inadvertence on the part of the trial justice and in no way vitiates the care and consideration he afforded proponent's motion.

The proponent in pressing this motion also alleges that the trial justice erred when in his rescript he stated that just prior to her husband's death, Valecia had chided Donald not to come home (from New York) until he found employment and a few hours later he was found dead, an apparent suicide. We have reviewed the record in this regard. There is evidence here that Donald Apollonio committed suicide and the court's interpretation of Valecia's remarks on this occasion is, we feel, a reasonable one.

The trial justice reviewed all the evidence and in doing so he exercised his independent judgment on the weight of the evidence, the credibility of the witnesses and the verdict. He has not misconceived the law nor overlooked any of the material evidence, and in keeping with our rule his decision will not be disturbed. *McSoley* v. *McSoley, supra; Malatt* v. *United Transit Co.*, 99 R. I. 263, 207 A.2d 39. The burden of proof is on the proponent to show that the trial justice was clearly wrong in denying his motion for a new trial. *Sullivan* v. *Marcello*, 100 R. I. 241, 214 A.2d 181. This he has failed to do. The proponent's exception on this point is overruled.

All of the proponent's exceptions are overruled, and the case is remitted to the superior court for entry of judgment on the verdict.

*Brosco & Brosco, Fred Brosco, Robert T. Flynn,* for appellant.

*Letts & Quinn, Daniel J. Murray, Harold B. Soloveitzik,* for appellees.