ROBERT R. GOFF *vs.* GEORGE C. CLINTON, *Ex.*

JANUARY 18, 1933.

PRESENT: Stearns, C. J., Rathbun, Sweeney, Murdock, and Hahn, JJ.

STEARNS, C. J.  This case is here on the bill of exceptions of George C. Clinton, executor of and residuary legatee under the will of Jennie B. Martin, late of the city of Providence, deceased.  A jury in the Superior Court found that the document offered for probate was not the will of Jennie B. Martin because it was executed under the undue influence of George C. Clinton—hereinafter called the proponent.  Counsel for proponent in his oral argument stated that the substantial exceptions are to the refusal of the trial justice to direct a verdict and to grant a new trial.  The evidence required the submission of the case to the jury. The refusal to direct a verdict was correct and the exception on this ground is overruled.  The single question of any importance is: did the trial justice err in refusing to grant a new trial for the reason that the verdict is contrary to the law and the weight of the evidence.

Jennie B. Martin was married in 1888.  No children were born of the marriage.  Her husband Frederick Martin died suddenly July 30, 1929.  By his will he left his entire estate to his widow and appointed her and Mr. Clinton executors of his will.  Mrs. Martin's estate at her death consisted of personal property to the value of $103,000.  If she had died intestate her sole heir at law would have been her brother, Robert R. Goff.  He was a man sixty years of age, unmarried and a teacher in a high school in Connecticut. The relations between the brother and sister were friendly and affectionate.  They exchanged letters and Mr. Goff called on his sister several times each year when he came to this State.  He invited her, after the death of her husband, to make her home with him.  She was pleased with this proof of his affection, but she decided to continue to live in her apartment in Providence—as she said—because Mr. Clinton had so advised her.  For the same reason she declined the invitation of a cousin to live with her in Pawtucket.

At the time Mrs. Martin was sixty-seven years of age, frail in body and in poor health.  After the death of her

husband, as one witness said, "she had lost a prop." Her mind and body grew gradually weaker until her death on August 27, 1930. During the last year of her life she was under the care of a nurse. She was in bed much of the time each day and seldom left her home. As her infirmity increased she was unable to go to the bank where she had a safe deposit box in the name of herself and the proponent. She was without business experience and lacked self-confidence. During her married life she had been dependent on her husband to an unusual extent. After his decease she relied entirely on the proponent for the management of her business affairs. He had been her husband's attorney and now became her attorney and personal adviser and was accustomed to visit her several times a week.

In September, 1929, her brother visited her. In response to his inquiry whether she needed any money she said: "No, not for the present at least. I hope I can get along." During this conversation she also said to her brother: "Sometimes I don't care whether I sink or not. But when I go you will get most of what I have."

In the Fall of 1929, when the question of making a will arose, Mrs. Martin stated to friends that the proponent would tell her when she should make a will. Proponent says that in January, 1930, acting on her instructions he prepared and submitted to her for her approval the draft of a will. Therein, after a bequest of $15,000 to her brother Robert and three bequests of $5,000 each to certain cousins, the name of the residuary legatee was left in blank to be filled in by Mrs. Martin. She approved the draft, asked proponent for a pencil and wrote in his name as residuary legatee. Proponent says he protested against this action and argued with her for ten minutes; that he told her "it would not look well" for him to write a will making himself the residuary legatee but that she would not heed his protest. This will was executed January 28, 1930, and was taken and retained by proponent. In the draft of the will proponent, without any authority, named himself as

executor. In the residuary clause of the will the explanation of the gift to him was stated to be "for the kindness to my late husband and myself extending over a period of years." There was also a clause in this will depriving any specific legatee of his legacy if he or she contested the will. Proponent says this last clause was inserted at the suggestion of Mrs. Martin. The only person who probably would object to this will was the brother of the testatrix.

As thus appears both the attorney and testatrix recognized that this will was of such a peculiar character that it would naturally be the subject of controversy. The attorney had been well paid for his services rendered to Mrs. Martin and her husband. He admits that he knew of no particular acts of kindness which warranted such a gift to himself.

Proponent testified that the day this will was executed and often thereafter he urged Mrs. Martin to have another attorney draw a new will; that for some time she refused but finally consented. Proponent telephoned an attorney whom he knew and told him he was in an embarrassing position; that Mrs. Martin wished to make a will and that he wanted her "to be a free agent and do just as she saw fit."

On February 17, 1930, proponent and this attorney went to Mrs. Martin's apartment. He was introduced to her by proponent and received from her a plan of the will he was requested to draft. This plan, with slight changes, was substantially the same as that of the first will. On February 19, 1930, the attorney, accompanied by proponent, again visited Mrs. Martin. On that day the will now in controversy was executed. Neither Mrs. Martin nor the proponent told the attorney of the existence of the former will. This attorney did not know the amount of the estate of the testatrix nor much if anything of her family connections. He undoubtedly acted in good faith, but his connection with Mrs. Martin's will was casual. He was paid for his services by proponent, who took and retained this will also. During both the visits of this attorney proponent

remained in another room in Mrs. Martin's apartment while the attorney talked with Mrs. Martin  She later told her nurse not to tell anyone that she had made a will.

On July 28, 1930, Mrs. Martin signed a petition for the appointment of a conservator of her estate, alleging therein that by reason of advanced age she had become incapable of properly caring for her property.  Her relatives had no notice of this petition.  On August 12 proponent was appointed the conservator of her estate.  Fifteen days later Mrs. Martin died.  Her physician signed the death certificate and testified at the trial that the cause of her death was senile dementia, from which she had suffered for a year prior to her death.

The evidence with respect to the testamentary capacity of the testatrix is conflicting.  Granting that there is sufficient evidence to support the special finding of the jury that testatrix had testamentary capacity, it seems sufficiently clear from the evidence that at the time of the execution of the will she was in such a weak mental condition as to make it easy for anyone whom she trusted to influence her and to control her actions.

In the case at bar the mere statement of the facts raised a question as to the validity of the will.  Testatrix told her brother that he was to receive most of her estate.  Why did she, without any apparent reason, give the greater part of it to proponent, her confidential adviser?  Her statement to her brother that she hoped she had enough money to "get along with" shows a failure to realize the amount of her estate.

By the will her brother is given $15,000, about a seventh of the estate, and proponent, a stranger in blood, is given about $73,000.  That testatrix for the most part was controlled by the advice and the suggestions of proponent is established by the evidence.  The situation was such as to make it an easy matter for proponent to improperly influence his client in the making of her will.  Did he take advantage

of the situation to benefit himself?   This was a question for the jury to decide.

Proponent denied the exercise of undue influence.   He testified that: "This woman could not be influenced." Such an unfounded statement casts discredit upon the proponent's testimony.

The will is unnatural and is contrary to the expressed intention -of the testatrix.   Her brother was  the natural object of her bounty and no reason appears for the supposed change of her intention.

The actions of the proponent, his power of control over the testatrix, the confidential relation of attorney and client, the provisions of the will, and the absence of any sufficient explanation for the making of such a will, are facts from which the jury properly could draw the conclusion that the will was the result of undue influence exercised by the proponent.   The intervention of an independent attorney, in the circumstances, did not remove the reasonable distrust of the first will.   No coercion of the testatrix is alleged. None perhaps was needed.   If proponent wished her to give him a legacy, the jury might properly find that the testatrix gave him what he wanted without regard to her own inclination to give most of her property to her brother.

The burden of proof of undue influence is on the contestant of the will.   To sustain this burden direct evidence is not indispensible.   From the nature of the issue circumstantial evidence is often the only evidence which can be presented.   The circumstances relevant to each case and the reasonable inferences therefrom are often of more persuasive weight in the decision of the issue of undue influence than the statements of interested witnesses.   See *Mullen* v. *McKeon*, 25 R. I. 305; *Huebel* v. *Baldwin*, 45 R. I. 40.

The trial justice has approved the verdict.   We are of the opinion that the case was properly submitted to the jury and that there is sufficient evidence to sustain the verdict.

All the exceptions have been considered, are found to be without merit and are overruled.

The case is remitted to the Superior Court for further proceedings following the verdict.

*Edwards & Angell, Elmer E. Tufts, Jr., William H. Edwards, Thorne Caldwell,* for appellant.

*John P. Beagan, Edward F. McElroy,* for appellee.