PETER DANTE *vs.* GUISEPPE QUILIETTI, *Admr.*

FEBRUARY 28, 1945.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.  This is a bill in equity for the cancellation of a mortgage. The bill contains no specific prayer for an accounting, but it does pray for general relief. At the conclusion of a hearing on the merits, the trial justice, in a

decision from the bench, first denied and dismissed the bill in its entirety; and then, upon the request of counsel for the complainant that certain credits be allowed under the prayer for general relief, he amended his decision to that extent and entered a final decree in accordance with the amended decision. The cause is before us on complainant's appeal from that decree.

Adolfo Quilietti, respondent's brother, died intestate on February 16, 1943. He never married. Complainant's wife was their sister. She died February 23, 1929. It was agreed by the parties that administration was properly granted on Adolfo's estate, which, including the mortgage in dispute, amounts to $17,500; and that this estate is to be divided into five distributive shares, one of which shares goes to complainant's two children.

The complainant and his daughter Elsie are the only witnesses in this cause. The respondent did not testify, as his counsel explained to the court that, other than finding the mortgage and note among Adolfo's papers, he knew nothing about the matter in controversy.

In view of complainant's main contention that the trial justice misconceived the evidence in this cause, we deem it necessary to review the testimony in some detail. Complainant testified that he sent Adolfo money to come to America from Italy about 1903; and that, with the exception of two short visits to the old country, one about 1906, when Adolfo went there to get his brother Guiseppe, and the other about 1936 for pleasure, he had always lived with the complainant. Sometime during this period Adolfo became the owner of the City Line Market, which complainant had to pass in going to Providence from his home on Columbus avenue in Pawtucket.

The mortgage involved in this cause is dated June 16, 1924. It was in the sum of $2800, with interest at 2%, and covers the premises occupied by complainant's family. Complainant testified that although Adolfo did not want or

expect any interest on this loan, the lawyer who drew the mortgage deemed it advisable to mention some rate of interest and therefore fixed it at 2%; and that after the original transaction was carried out he, the complainant, did not in any way concern himself further about the mortgage, as his wife took care of all his financial matters until her death. She never told him what arrangement she had with Adolfo as to board and lodging, or what payments, if any, she made on the mortgage; nor did he at any time ask her any questions respecting the mortgage, excepting as follows: Two weeks before she died, he spoke to her about Adolfo's mortgage and she then merely told him not to worry about it and that the only thing he had to worry about was the "big house". We note here that a Pawtucket bank held a mortgage on a larger house of the complainant.

In the family readjustment that followed the death of complainant's wife, his eighteen year old daughter, Elsie, became the "housekeeper". Complainant testified that between 1929 and 1930 he asked Adolfo several times what was owing on the mortgage and that, even though he told Adolfo that he was thinking of substituting a bank mortgage for it, the only answer complainant received was that they would discuss the matter "bye and bye". According to his testimony, he also told Adolfo that some arrangement had to be made about the latter's board and lodging but he "couldn't get anything out of him." In this situation, he told Adolfo that his daughter would have more time to talk to him. He therefore left all matters to be adjusted by Elsie and gave them no further personal attention from that time until the death of Adolfo, when he first became aware that the mortgage had been paid in full by payments which had been made by his wife before 1929 and by credits agreed to by Adolfo under alleged agreements with Elsie, when complainant was not present, in 1929 and 1936. He admitted that he knew the terms of these agreements and was permitted to relate them in detail. We will presently refer to these agreements in connection with Elsie's testimony.

In the course of his testimony, complainant introduced in evidence an ordinary school composition blankbook which admittedly belonged to Adolfo and in which he apparently kept certain records of his financial affairs. Complainant testified that he had seen this book once in the lifetime of his wife, when Adolfo was marking therein a payment on the mortgage which she had just made. The next time he saw it was shortly after Adolfo's funeral. At that time, according to him, an unidentified relative was looking through some of Adolfo's papers and, finding this book, threw it into a wastebasket, from which it was recovered.

With the exception of numerals, all entries in this book are in Italian. The entries that were translated for the record before us show five payments on the mortgage, as follows: May 31, $400; November 24, $200; December 5, $200; May 9, 1927, $300; and July 3, 1927, $200. Each of these entries, which appear in the book in the order and form just mentioned, is followed by the signature of the deceased. The payments thus acknowledged amount to $1300.

The testimony of complainant's daughter Elsie covers the period from February 1929 to the death of Adolfo in 1943. She testified that when, in the absence of her father, she asked Adolfo what payments her mother had made on the mortgage, he produced the above-mentioned book and "showed me how much. . . . But I didn't get a chance to read it. He closed the book up right away." She then asked him: "Did my mother pay any *more* before she died?" and his answer was $300 that he did not put in the book. (italics ours) Her testimony on this point, taken as a whole, is to the effect that, except for the $300 just mentioned, she never knew how much her mother had paid on the mortgage until Adolfo's book was fortuitously recovered by her father in the manner hereinbefore described.

Elsie further testified that in February or March of 1929 she agreed with Adolfo that thereafter he was to pay for his board, lodging and laundry at the rate of $40 a month, $20 to be paid in cash and $20 to be applied as monthly

credits on the principal of the mortgage; that this agreement continued in force and payments were regularly made thereunder on the first of each month until 1936, when Adolfo decided to take his meals with his brother Guiseppe, the respondent here, who was married and lived nearby; that a new agreement was then made under which Adolfo thereafter was to pay $5 a month in cash and credit $15 on the mortgage; that payments on this basis were duly made on the first of each month until he died in 1943; that she kept no records of any kind in reference to either of these agreements; and that she at no time, while the agreements were in force, asked Adolfo what was the balance on the mortgage. As far as the testimony shows, Adolfo's book contained no entries respecting these agreements.

We need to refer to a few other matters for a comprehensive view of the circumstances in this cause. It appears in evidence that from June 1924, when the mortgage was executed, to Adolfo's death in 1943, no interest was paid or demanded on the mortgage and that apparently no such payment is recorded in Adolfo's book; also, that during this entire period Adolfo was in the grocery business and ran the City Line Market hereinbefore mentioned; that while complainant's wife was living she traded with him, he bringing the food home in his delivery truck; and that after her death the complainant, although he had no automobile and Adolfo was living in his home, traded either at local stores, or, passing by Adolfo's market, went to Providence for provisions.

The testimony that we are about to outline bears upon the feelings which complainant and his daughter manifested during the trial. As complainant had repeatedly stated that the deceased would give him no information respecting the balance of the mortgage, he was asked, in cross-examination, if Adolfo was a "reasonable man", which question he answered: "Sometimes he was. . . . Sometimes he wasn't. Depend on how his business was running, I suppose."

When respondent's counsel asked him if Adolfo was an "honest man", his answer was: "As far as I know." This

led to the following questions and answers: "Q. He always treated you fairly? A. Yes. To a certain extent. Q. What do you mean by that, Mr. Dante? A. Why, I sent him over money twice (meaning to Italy) and he *never paid it back.* . . . Q. Did you ever mention that money to Mr. Quilietti? A. I certainly did. Q. When did you mention it to him? A. I mention it previous to he died and I mention it to his brother and both said they has paid it back. *I don't know whether they did or not.* Q. Let me see if I understand that answer. You say you mentioned it before he died? A. About a year before he died. Q. Was that the *first time* you mentioned about this money? A. Yes. . . . Q. And from 1906 to 1941 so far as you recall no mention was made of the money? A. No." (italics ours)

In cross-examination Elsie expressed herself as follows on the point under consideration: "Q. Now, you would say that your uncle was an honest man, wasn't he, Miss Dante? A. I think he was. Q. What is that? A. I think so. Q. Well, do you have some doubt about it? A. I don't know. I couldn't say. . . . Q. You were born around 1910,—that right? A. Yes. . . . Q. He lived at your home for thirty-three years. That correct? From 1910 to 1943 or thereabouts? A. Yes. Q. And you can't tell us whether or not he was—you considered him to be an honest man? A. No, I don't know. He would work all day and at night he would come home and go to bed early and I never had a chance to hardly know him. Q. You felt he was somewhat of a stranger? A. Well, that is the way I felt about him."

The difficulty in this cause is one of fact and its solution depends almost entirely upon credibility. The law that governs in this class of cases is well established. The bill here seeks the cancellation of an admittedly valid mortgage belonging to Adolfo's estate, which complainant claims to have paid. Where the relief sought is the cancellation of an instrument, the complainant must establish his right thereto by a preponderance of clear and convincing evidence. See *New England Box & Barrel Co.* v. *Travelers Fire Ins. Co.,* 63 R. I.

315, at page 320, and cases cited. In reaching a decision in such a case, the probabilities or improbabilities disclosed by the evidence, especially if the ultimate conclusion depends upon the credibility that is attached to the testimony of parties or witnesses, are important factors for court or jury to consider.

The complainant strongly contends that merely because the trial justice found nothing in Adolfo's book tending to show any credits on the mortgage in accordance with the agreements of 1929 and 1936, therefore the uncontradicted testimony of himself and Elsie was not given the credence that it fairly deserved. On this interpretation of the court's decision, he argues that the trial justice misconceived the evidence and that hence we should not give to his decision the weight that is ordinarily accorded to the decision of a trial justice when properly rendered.

We agree with the complainant that the trial justice did not express himself as clearly as he might have respecting the weight that he gave to Adolfo's book in connection with the testimony in the cause. But we cannot agree that complainant's interpretation is the only reasonable one that can be given to the language of the trial justice in that respect.

Before referring to the book in any way, the trial justice fairly considers the testimony of both the complainant and his daughter. In the course of such consideration he plainly expresses his refusal to accept their testimony as clear and convincing proof that their dealings with Adolfo respecting the mortgage and its ultimate payment were as testified to by them. When his decision is read as a whole, we interpret his language in reference to the book to mean that it was difficult for him to believe that Adolfo would have failed to mention therein, in some way, any payments or credits on the mortgage subsequent to those so meticulously acknowledged by him, if they were in fact made.

In support of his contention, complainant argues that the entries in the book refer only to matters occurring before the death of his wife and therefore nothing therein could refer

to any transaction after that date; and he suggests further that the payment of $300 which, according to Elsie, Adolfo admitted having received from her mother some time between 1927 and 1929, was not entered in the book because there was no room on the page on which the mother's payments appear. This argument and suggestion are not persuasive when the book is carefully examined.

The book, the pages of which are not numbered, is crudely but apparently accurately kept as to substance. Many entries are without date, especially as to the year. However, on page 34, by our count, the year 1930 is clearly written in black pencil at the top of that page; and on page 35, in a similar position, the year 1931 appears in red pencil. Beneath both of these years are entries and figures covering over two-thirds of those pages. These entries, which are admittedly in Adolfo's handwriting, show that the book was used and entries were made therein by him after 1929.

Complainant's suggestion that Adolfo failed to enter the $300 for the probable reason above stated is without force. There are numerous blank pages in the book where such an entry could have been made. This is especially so since, on the very last page of the book, there is a summary of the payments which we have hereinbefore described in detail. There is plenty of blank space on that page for the entry of an additional payment.

The evidence in this cause presents a conflict of probabilities. The complainant in substance insists that the agreements of 1929 and 1936, being unaffected by any entries in Adolfo's book after 1929, are established without contradiction. He points out that the agreements were reasonable and most favorable to Adolfo; that they represented a friendly family arrangement; and that no payments were otherwise made or demanded on the mortgage at any time. The respondent, on the other hand, argues that the whole course of conduct of the complainant and his daughter with reference to the mortgage was unreasonable; that, if they made payments on the mortgage as claimed, they would

have paid a total sum of $4510 on a $2800 mortgage, even if it carried no interest; that it is most unusual that a debtor in this situation would ask merely for a cancellation of his obligation and not ask reimbursement for overpayment; and that, after the death of complainant's wife, the relations between the parties were not as friendly as complainant would like to have them appear, so as not to impair the force of his testimony and that of his daughter.

The decision of the trial justice shows that, from a consideration of the evidence and the reasonable inferences therefrom, without reference to Adolfo's book, he was of the opinion that complainant had failed to prove his claim by clear and convincing evidence. The trial justice questioned the credibility of both the complainant and his daughter, and he further specifically found that prejudice was shown by them on the witness stand.

The trial justice had the opportunity of observing the complainant and his daughter while testifying, a distinct advantage in deciding a cause the determination of which depends almost entirely upon their testimony. From an examination of all the evidence before us we cannot say that the trial justice was clearly wrong in denying the relief sought by the complainant.

Complainant's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Henry E. Crowe, Thomas Hetherington,* for complainant.
*Woolley, Blais & Quinn, John F. Quinn,* for respondent.