DECISION
Before the Court is the petition of James Larmore, III ("Petitioner" or "Larmore"), seeking to reform a 1968 trust of which he is settlor and lifetime income beneficiary. Respondents opposing the petition are Petitioner's cousins and their children, who are potential residual beneficiaries under the trust. Jurisdiction is pursuant to G.L. 1956 § 8-2-13 (2006).
 Facts and Travel
Understanding the present posture of this case requires a retelling of Petitioner's youth and family history. Mr. Larmore was born on July 9, 1943 in Los Angeles, California. (Transcript of trial before Justice Procaccini, June 14, 2005,[1] 3.) The family patriarch was his maternal grandfather, Charles W. Brackett, a graduate of Harvard Law School and successful writer and producer of motion pictures in Hollywood. (Tr. 15.) Mr. Brackett had two daughters, Alexandra and Elizabeth — Petitioner's mother and aunt, respectively — who are now deceased. (Tr. 8.) Family success and wealth did not repel difficulties marked by extensive alcoholism in Petitioner's maternal grandmother, both his parents, and eventually himself. (Tr. 62-63.) The parents' alcoholism was severe, and it was Charles Brackett who filled a large void during Petitioner's youth, providing moral and financial support and taking Petitioner into his own home during his parents' worst drinking bouts. (Tr. 21-22.) When Petitioner was arrested in 1961 or 1962 for burglary and assault with a dangerous weapon, his grandfather hired an attorney, Grant Cooper, who was able to obtain an alternative disposition whereby Petitioner was sent to the Menninger Clinic, a psychiatric hospital in Topeka, Kansas. (Tr. 17-19.) Grant Cooper also represented Petitioner in settling a civil action that resulted from the assault and later assisted Petitioner in creating the trust now at issue. (Tr. 18-19.)
In the summer of 1964, while in Los Angeles on a furlough from the Menninger Clinic, Petitioner was again arrested for burglary and again received probation and was returned to the Clinic. (Tr. 25-26.) The following year, Petitioner's parents passed away in Los Angeles, their deaths occurring one month apart, while Petitioner was still hospitalized in Kansas. (Tr. 26.) Also during Petitioner's second stay at Menninger, his grandfather suffered one or more serious strokes and was left incommunicative. (Tr. 27.) While at the Menninger Clinic, Petitioner was diagnosed with a number of personality disorders. (Tr. 62.) He was finally discharged and returned to Los Angeles in June, 1968. (Tr. 27.)
Petitioner again stayed at his grandfather's home before moving into an apartment with Gaylan Woodard, a fellow patient at Menninger whom he married in August of 1968. (Tr. 4, 28.) Gaylan shared Petitioner's drinking habit and also suffered from psychiatric problems. (Tr. 31, 33.) This was the state of affairs in November 1968 when Petitioner created the trust that he now seeks to reform.
Shortly after his release from the Menninger Clinic and return to Los Angeles, Petitioner was telephoned by Grant Cooper, his previous attorney, and asked to an appointment at Cooper's home. (Tr. 29.) Cooper informed Petitioner that he had acquired funds that needed to be protected in case Petitioner was again institutionalized.[2] (Tr. 10, 30, 68.) Cooper told Petitioner that the best way to attain this objective was by creating an irrevocable trust. (Tr. 12, 68.) Cooper also stated that it was the desire of Petitioner's grandfather, Charles Brackett, that Petitioner create a trust with these funds. (Tr. 12, 76.) A few months after this meeting, in November 1968, Petitioner executed the trust now at issue; he did not meet with Cooper again and believes that the trust was drafted by another attorney whom Cooper had contacted. (Tr. 7; Deposition of James Larmore, III conducted June 13, 2005,[3] 39-40.)
The trust document names the Industrial National Bank of Rhode Island as trustee and Spencer B. Eddy as co-trustee. (Plaintiff's Exhibit 1, Appx. A,[4] 1.) Spencer Eddy was a law partner of Charles Brackett in New York, and his name was inserted into the trust document as the co-trustee by Grant Cooper. (Tr. 14-15.) Mr. Larmore, as the trust settlor, is to receive trust income for the comfortable support of himself and any wife and children. (Trust, 4, ¶ 3.) Under the terms of the trust, Petitioner has a limited power of appointment: if he is survived by descendents or a spouse with whom he was living, the trust principal is to be distributed to those family members upon Petitioner's death according to terms of his Will and Testament. (Trust 5-6, ¶ 5.) If, however, Petitioner is survived by neither descendents nor a wife with whom he was living, the trust estate is to revert to Mr. and Mrs. Charles Brackett or their survivors. (Trust 6, ¶ 5.)
Petitioner has seen many changes in his personal life since 1968. He entered Alcoholics' Anonymous and had his last drink in 1974. (Tr. 31.) Petitioner no longer lives with his wife — the couple separated in 1985 — but Petitioner has not taken any steps to legally terminate the marriage and continues to provide financial support to Gaylan. (Tr. 4, 33-34, 77-78.) He does not have any children. (Tr. 4.) Since 1992, Petitioner has been close with a new friend, Eileen Ito-Neufeld. (Tr. 32.) He is also close with Ms. Ito-Neufeld's adult daughter, Selena Robledo, and four grandchildren. (Id.) Petitioner wishes to be able to help provide for Ms. Ito-Neufeld and her family and is considering adopting Ms. Robledo, although her father is alive and no legal steps have been taken toward adoption. (Tr. 77, 86.) He also would like to continue giving some financial support to his current wife, whom he doesn't wish to abandon while she continues to cope with depression. (Tr. 33, 43.) His primary source of income comes to him as beneficiary of this trust, approximately $19,200 per year, and another trust set up by Charles Brackett that pays approximately $28,800 per year. (Tr. 82.) The present value of the trust corpus at issue is approximately $732,000. (Tr. 81.) In 2000 or 2001, Petitioner contacted Fleet National Bank, corporate successor as trustee, to inquire about gaining access to trust funds in order to pursue these objectives. (Tr. 35.) So started the process that now comes before this Court.
Petitioner's effort to reform the trust first took the form of an uncontested petition, filed with this court in March 2003 after Respondents James Moore and Victoria Moore-Tennaro — Petitioner's cousins and potential residual beneficiaries under paragraph five of the Trust — indicated their consent and waived further notice. See Pl. Ex. 3 (Verified Petition to Reform Trust), Pl. Ex. 5 (Mr. Moore's Answer), Pl. Ex. 6 (Assent of Mr. Moore to judgment for Petitioner), Pl. Ex.9 (Ms. Moore-Tennaro's Answer.) It appeared that the case would continue to be uncontested one year later when an amended petition, adding Mr. Moore's children — Charlotte, Carter, and Stephanie — as Respondents and indicating their consent to reformation, was filed. See Pl. Ex. 1 (Amended Verified Petition to Reform Trust), Pl. Ex. 7-8 (Answers of two Moore children.) In those petitions, Mr. Larmore argued that circumstances had changed since he created the trust, and he sought modification of the trust to give him a power of revocation. (Pl. Ex. 1.) Shortly after that time, however, Mr. Moore became aware that the trust was of greater value than he previously believed and filed papers with the Court to revoke his assent and contest Petitioner's efforts.[5] As a result of this change, Petitioner tells the Court he has abandoned his theory of changed circumstances and is no longer seeking the power to revoke the trust. (Post-trial Memorandum of Respondents 4.) Instead, Petitioner now seeks to have a greater power of appointment over the trust remainder, arguing that the limitation in paragraph five of the trust was a result of undue influence exerted by Grant Cooper and, through Cooper, Charles Brackett. (Id.)
 Standard of Review
In a non-jury trial, the trial justice sits as the trier of fact as well as of law. Hood v. Hawkins, 478 A.2d 181, 184
(R.I. 1984). "Consequently, he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." The factual determinations and credibility assessments of a trial justice "traditionally accords a great deal of respect . . . [because it is] the judicial officer who actually observes the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of theDissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975
(R.I. 2006). Although the trial justice is required to make specific findings of fact, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. 52(a).
 Analysis
It is no mere matter of course for the settlor of an inter vivos trust to modify its terms, for as the Rhode Island Supreme Court has stated:
 "A court will not annul dispositions of property, because they are improvident, or such as a wise man would not have made or a man of nice honor consented to receive; but all the contracts of an individual, even his gratuitous acts, if formally executed and no power of revocation reserved, are binding, unless they can be avoided because of surprise, or mistake, want of freedom, undue influence, the suggestion of a falsehood or the suppression of truth." Vaill v. McPhail, 35 R.I. 412, 424, 87 A. 188, 193 (1913) (quoting Green v. Thompson, 37 N.C. 365, 368 (2 Ired. Eq. 365) (1842)).
However, despite the principle of finality of contract, injustices of the sort mentioned will not be allowed to stand for "acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning or artifice, or undue influence." Anthony v.Hutchins, 10 R.I. 165, 176 (1872).
Here, only Petitioner's allegation of undue influence is at issue: no questions of surprise, mistake, or fraud are raised in this case. Undue influence occurs when the free will of one disposing of property is overcome and in its place is substituted the will of a dominant party. Caranci v. Howard, 708 A.2d 1321,1324 (R.I. 1998) (citing Marcinko v. D'Antuono, 104 R.I. 172,181, 243 A.2d 104, 109 (1968)). Ordinarily, one asserting undue influence as a basis for cancellation of an instrument bears the burden of showing such influence by clear and convincing evidence. Passarelli v. Passarelli, 94 R.I. 157, 159,179 A.2d 330, 332 (1962) (citing Beaudoin v. Beaudoin, 85 R.I. 465,132 A.2d 834 (1957); Dante v. Quilietti, 71 R.I. 4, 41 A.2d 306
(1945)).[6] However, undue influence may be presumed when certain circumstances surround a disposition: "where a relationship of trust and confidence exists between a grantor and a grantee, it is generally held that the burden is on the grantee to establish that the transfer was the deliberate and voluntary act of the grantor and that the transaction was fair, proper, and reasonable in all circumstances." Id. at 159-60,132 A.2d at 332. If the presumption is applicable, then the proponent of the disposition bears "the burden of going forward," for the presumption is a sufficient basis for a finding of undue influence and judgment voiding the disposition. Murphy v.O'Neill, 454 A.2d. 248, 249-50 (R.I. 1983) (citing Giblin v.Dudley Hardware Co., 44 R.I. 371, 375, 117 A. 418, 419 (1922)). Petitioner argues that this presumption applies in the present case, acting to place upon Respondents the burden of showing fairness and volition in the creation of the trust. In order to properly place the burden of proof on the party that must carry it, the Court will first address whether a presumption of undue influence arises from the circumstances under which this trust was created.
The burden of proof
The Rhode Island Supreme Court has stated in unambiguous language that the presumption "is in this state restricted in its application to those [cases] in which the relationship between the grantor and the grantee is fiduciary in its nature."Passarelli, 94 R.I. at 160, 132 A.2d at 332; see alsoCaranci, 708 A.2d at 1324; Earle v. Chace, 12 R.I. 374
(1879). Furthermore, courts should apply this presumptive rule "with considerable latitude of discrimination." Earle,12 R.I. 374, 1879 WL 3574, *3.
Here, Petitioner did not discuss the trust with his cousin before signing it, while Mr. Moore's children were not yet born at the time; so Respondents clearly played no role at all, let alone one of trust and confidence, in the 1968 creation of the trust. (Tr. 57-58.) Petitioner cites cases from other jurisdictions applying a presumption of undueinfluence to non-beneficiary third parties. See Swenson v. Wingercorn,92 Ill. App. 2d 88, 234 N.E.2d 91 (1968); Montoya v. Torres,823 P.2d 905 (N.M., 1991). The clear language of the Rhode Island Supreme Court, supra, precludes this Court from reliance on such holdings. In this state, it is a beneficiary, grantee, or some other individual benefiting from a disposition of property who must have stood in a relationship of trust and confidence to the grantor for a presumption of undue influence to arise.[7] Therefore, any influence exerted by the attorney Grant Cooper and through him, arguably, by Charles Brackett for the benefit of Respondents cannot give rise to a presumption.
Aware of this rigid limitation, Petitioner has also argued that there was personal benefit involved for Charles Brackett. In a sense, Brackett benefited by increasing the likelihood of the trust estate remaining in his blood line, to the possible disadvantage of members of Petitioner's family from the paternal side — descendents of Charles Brackett's son-in-law — who would share in the estate under intestacy laws but not under paragraph five of the trust. More directly, Charles Brackett stood to gain in the event that Petitioner predeceased him (or his wife) without children or a wife with whom he was living, as paragraph five states that the trust estate would then be paid over to Brackett. While the Court is constrained to dismiss any presumption arising out of non-beneficiary third party influence, this argument requires careful examination.
In each case cited by the parties wherein the Rhode Island Supreme Court has applied the presumption of undue influence to shift the burden to the proponent of a disposition, highly suspect circumstances were present. Huebel v. Baldwin involved a challenge to the will of an elderly, childless widow, which purported to leave her entire estate to a much younger man who had been running her going business and imposing no obligation either to continue the business or to provide for the woman's niece — her only heir and next of kin whom she had provided for since the niece's orphanage and had promised to leave well-provided for. 45 R.I. 40, 119 A. 639 (1923). There, the Rhode Island Supreme Court stated, "[t]he circumstances are suspicious and such as called for some explanation." Id. at 45,119 A. at 641; see also Caranci, 708 A.2d 1321 (will of 90-year-old woman — never married and without close family — named a relatively recent acquaintance as sole beneficiary, was drafted by attorney who was long-time business colleague of beneficiary but had never met testator, and revoked previous will under which close childhood friend was principal beneficiary);Apollonio v. Kenyon, 101 R.I. 578, 225 A.2d 778 (1967) (sole beneficiary under will was clerk of probate court and town clerk whom testator had consulted regularly, and who arranged and attended meeting with attorney drawing will due to testator's fear of lawyers); Kerr v. McKenna, 57 R.I. 252, 189 A. 408
(1937) (deed executed by an elderly and sickly woman nine days before her death conveyed her real estate to a friend and neighbor who was providing for her care at the time, disinheriting a relative who was the devisee of the property under a will made by the woman only eight months earlier);Hoppin v. Tobey, 9 R.I. 42 (1868) (grantee of $10,000 estate for consideration of $10 and past services — already fully paid — had been executor of estate during grantor's minority since death of grantor's mother, and before that had managed the mother's business affairs).
It must be kept in mind that the presumption, when it is applied, acts as an exception to the general rule that one seeking to alter a revocable disposition must show his right to do so by clear and convincing evidence. In its limited role, the presumption is used as a rule of burden-shifting when "circumstances are suspicious and . . . call for some explanation." Huebel, 45 R.I. at 45. When one benefiting from another's disposition of property played a role involving trust and confidence in the disposition, suspicions are raised in a court of equity and the benefiting party must assuage these suspicions if the disposition is to stand. A more expansive application of the rule would undermine the binding effect the law generally gives to irrevocable dispositions. These two interests — the finality of contract and prevention of fraud or abuse — are best reconciled by continuing to apply the presumption only where "the mere statement of the facts raise[s] a question as to the validity of the [instrument]." Goff v.Clinton, 53 R.I. 70, 74, 163 A. 747, 749 (1933). On the other hand, if the suspect circumstances that justify this exception are not present, there is no basis for relieving the challenging party of his burden.
Under this balanced framework, and mindful that courts of equity should use "considerable latitude of discrimination" before shifting the burden in such cases, the Court does not recognize a presumption of undue influence. The benefit that Charles Brackett sought or gained is clearly different from the benefits obtained by fiduciaries in the above-cited cases, wherein persons with trust and confidence were named as immediate grantees in deeds of conveyance or direct beneficiaries of trusts or wills. The relationship of Petitioner to his grandfather and to the attorney selected by his grandfather are not such as to raise the Court's suspicion and alone justify shifting the burden of proof away from Petitioner as the settlor of a trust he now seeks to modify. It is therefore for Petitioner to establish, by clear and convincing evidence, his right to modify the trust.
Evidence of undue influence
Determining whether undue influence existed over a party disposing of property is a fact-intensive inquiry, depending on a totality of the circumstances. Filippi v. Filippi,818 A.2d 608, 630 (R.I. 2003) (citing Tinney v. Tinney, 770 A.2d 420,428, 438 (R.I. 2001)). Evidence of a mere opportunity to exert influence, without a showing that impermissible influence was in fact applied, is insufficient for a finding of undue influence.Caranci, 708 A.2d at 1324; Reynolds v. Marsden, 60 R.I. 91,97, 197 A. 193, 196 (1938). A finding of undue influence cannot be based on "mere suspicion, surmise or conjecture." Caranci,708 A.2d at 1327 (quoting Popko v. Janik, 341 Mass. 212, 215,167 N.E.2d 853, 855 (1960)). Because undue influence tends to be exerted in secret, proof by direct evidence is unlikely and circumstantial evidence is more often used. Apollonio,101 R.I. at 593, 225 A.2d at 787 (citing Smith v. Smith, 54 R.I. 402,173 A. 539 (1934)). Thus, undue influence may be inferred from an unexplained and unnatural disposition of property in combination with other relevant factors. Caranci, 708 A.2d at 1327 (citingMurphy, 454 A.2d at 249). Relevant surrounding circumstances include "the relationship between the parties, the physical and mental condition of the grantor, the opportunity and disposition of a person wielding influence, and his or her acts and declarations." Filippi, 818 A.2d at 630 (citing Tinney,770 A.2d at 428)).
In considering the relationship between the parties, the Court notes that Grant Cooper acted as Petitioner's counsel but was selected and paid by Charles Brackett; such payment arrangements can raise concerns of third-party influence and mixed loyalty in the attorney-client relationship. See, e.g., Rules ofProfessional Conduct, R.I. Sup. Ct. Art. V, Rule 1.8(f). The Court finds that this arrangement presented at most an opportunity to exert influence, which by itself is insufficient for a finding of undue influence. Caranci, 708 A.2d at 1324.
The more important relationship to examine is the one between Petitioner and his grandfather. This factor weighs against a finding of undue influence for two reasons. First, Charles Brackett was left unable to communicate due to a serious stroke, and his last conversation with Petitioner took place four years prior to the creation of the trust. This does not foreclose the possibility that some influence was exerted by proxy through Grant Cooper as Petitioner argues, nor does it affect the fact that Petitioner continued to rely financially on the income from his grandfather's trusts. Nonetheless, the Court finds that the lack of a communicative relationship between Petitioner and his grandfather reduces the likelihood of influence sufficient to overcome Petitioner's will. The relationships in which the presence of undue influence have been considered by the Rhode Island Supreme Court have involved regular involvement by a dominant party in the business affairs and/or the personal care of a subservient party. See, e.g., Caranci, 708 A.2d 1321;Apollonio, 101 R.I. 578, 225 A.2d 778; Huebel, 45 R.I. 40,119 A. 639; Hoppin, 9 R.I. 42. In contrast, any pressure that could have been exerted in Petitioner's relationship with his grandfather — by proxy and during a single conversation — would have a far less dominating effect.
Second, it must be noted that not all influence is undue; what a party contesting an instrument might characterize as undue influence can in fact be proper and natural persuasion or joint decision-taking. 25 Am. Jur. 2d Duress and Undue Influence § 37 (2006). For example, when the children of a deceased trust settlor sought to avoid amendments to a trust allegedly made under the undue influence of their step-mother, the Rhode Island Supreme Court stated, "[the settlor's] wife of nineteen years had every right to exert influence over [him], and she did just that." Filippi, 818 A. 2d at 630. Furthermore, an act of gratitude, born in appreciation of a relationship of trust and confidence, can negate an inference of undue influence that such relationship was abused. See Kerr, 57 R.I. at 252,189 A.2d at 409. The Court finds these points to be applicable here. Charles Brackett had played a large role in helping Petitioner cope with, and eventually escape from, a difficult childhood and adolescence; Petitioner described Brackett as "more like a parent . . . in his interest and responsibilities of my upbringing" than his mother and father. (Dep. 20.) The crux of Petitioner's claim is that Grant Cooper brought undue influence to bear by stating that it was his grandfather's wish that Petitioner create this trust. (Tr. 93.) Petitioner stated that this was important to him because his grandfather "probably wasn't going to be around much longer, and he . . . was my connection to stability." (Id.) The Court finds that it was not undue influence for Grant Cooper to express Charles Brackett's wishes to Petitioner in an attempt to persuade him to create this trust. As Petitioner's primary benefactor and parent-figure, Brackett had a legitimate concern in the dissipation of Petitioner's estate and in encouraging Petitioner to create the irrevocable trust in general. Paragraph five in particular served this interest by requiring any marriage to be legitimate and continuing, thereby protecting Petitioner from the opportunism of others. Nor is the fact that these considerations weighed heavily in Petitioner's mind necessarily evidence that his will was overcome; given the role Charles Brackett played in his life, the Court finds such considerations were "simple and expected consequence[s] of human friendship and compassion." 25 Am. Jur. 2d § 37.
The physical and mental condition of a grantor at the time of a disposition is another factor in determining whether his will was overcome by undue influence. The evidence of Petitioner's condition at the time he created the trust is mixed. He was acclimating to life back in Los Angeles after his release from the structured and controlled environment of the Menninger Clinic. He had been diagnosed with a number of personality disorders and had a drinking problem at this time, including "a couple of drunk driving charges." (Tr. 31.) His new wife had been a fellow patient and was "often drinking along side" of him. (Id.) Both of Petitioner's parents died prematurely during his time in Kansas, and he was not fully aware of his grandfather's condition until his return to Los Angeles. (Tr. 28.) On the other hand, Petitioner testified that by November 1968, when he signed the trust instrument, his condition had improved due to having some time on his own, moving into his own apartment, and enrolling in art school. (Tr. 29.) While these facts demonstrate some level of independence, the Court finds that in the latter part of 1968, Petitioner was physically and mentally ill and susceptible to the influence of others as a result of his alcoholism, psychological problems, and personal difficulties. However, the susceptibility of a grantor, like the opportunity of a grantee, alone is not sufficient for a showing of undue influence; susceptibility is treated only as a factor in the inquiry. See Appolonio, 101 R.I. at 594, 225 A.2d at 787. Nor is reliance born out of such susceptibility, without some form of abuse, sufficient. Passarelli, 94 R.I. at 160-62,179 A.2d at 332-33. Thus, the Court finds that while Petitioner's susceptibility created greater opportunities for undue influence over him, it is not evidence that his will was, in fact, overcome.
The opportunity and disposition of the two persons who Petitioner argues wielded influence over him must be considered. The opportunity for Charles Brackett to wield influence need not be considered separately since it could only be done by proxy through the attorney Grant Cooper. As previously alluded to, the Court finds that the selection and payment of Cooper by Charles Brackett, as well as Petitioner's mental and physical state presented some opportunity for the exercise of influence. However, this opportunity was minimal; Petitioner testified that he met with Cooper on only one occasion to discuss the trust, several weeks before he signed the trust instrument prepared by another attorney. (Dep. 39-40.) Cases where the possibility of undue influence has been considered generally involve far more regular, often on-going, opportunities for the exertion of influence. See Caranci, 708 A.2d 1321 (undue influence exerted by business acquaintance); Apollonio, 101 R.I. 578,225 A.2d 778 (city clerk whom grantor regularly asked for advice);Kerr, 57 R.I. 252, 189 A. 408 (estate executor and business manager for two generations); Goff, 53 R.I. 70, 163 A. 747
(sole business manager, attorney, and personal advisor);Huebel, 45 R.I. 40 (everyday business manager). The Court finds that the opportunity for Charles Brackett and Grant Cooper to exert influence on Petitioner was slight.
As for the disposition of Cooper and Brackett, the Court finds no evidence that favors a finding of undue influence. Grant Cooper was a successful criminal defense attorney who represented Petitioner, with apparent success, to obtain alternative sentences following his criminal activities; nothing suggests a disposition on Cooper's part to overcome Petitioner's will. As for Charles Brackett, he was by Petitioner's own account the primary source of support and stability in Petitioner's troubled youth. Petitioner's theory of undue influence rests on the statement of Brackett's wishes made to Petitioner by Cooper; the Court finds this evidence fails to suggest a disposition on the part of Brackett to overcome the will of Petitioner and finds that a continued concern for Petitioner's well-being and troubled past to be a more likely explanation. In fact, Petitioner testified that in 1968, he was also uncertain of his future and believed protecting his estate "seemed like it was a prudent thing to do. . . ." (Tr. 30.) Thus, the opportunity and disposition of the parties alleged to have exerted undue influence is another factor weighing against Petitioner's claim.
Finally, the Court finds that the acts and declarations of Grant Cooper and Charles Brackett do not support Petitioner's claim. Again, the only act or declaration Petitioner relies on is Cooper's statement that Brackett wished for Petitioner to create this trust. There is no evidence that any party wielding influence sought to estrange Petitioner from others. SeeCaranci, 708 A.2d at 1328. Nor is there evidence that Petitioner was pressured to create this trust in a rushed manner.See id. at 1323. The Court finds that Cooper's single statement five months prior to the signing of the trust instrument does not amount to active solicitation or persuasion.See 25 Am. Jur. 2d § 37. Finally, the Court notes that there was not any concealment of the transaction by Cooper. See id.
The Court finds that creation of the trust and inclusion of paragraph five therein were not unnatural or suspicious, but rather a reasonable and calculated means of estate planning. In 1968, Petitioner's circumstances were very different and more difficult than they are today. It was reasonable for Grant Cooper to consider that these circumstances put Petitioner's estate at risk of dissipation and to advise that some protection be set up. Given Petitioner's mental health problems, the limitation of paragraph five is a reasonable feature of this protection, whatever difficulties it now poses for Petitioner.
 Conclusion
To summarize the facts of this case, the Court can borrow today the words of the Rhode Island Supreme Court written in 1909:
 "This case falls clearly within the principles of a number of cases . . . where the settlor, seeking protection . . . against the probable consequences of the settlor's own weakness or infirmity, had made voluntary settlements in trust without power of revocation; and subsequently sought to revoke them by means of suit in equity; the courts refused the relief sought." Wallace v. Industrial Trust Co., 29 R.I. 550, 560, 73 A. 25, 29 (1909).
On the basis of the evidence, the Court finds that Petitioner has failed to show by clear and convincing evidence that his creation of the 1968 trust, or inclusion of paragraph five therein, was a result of undue influence. Therefore, Petitioner has not proven to this Court any basis that would allow for reformation of the trust. The petition is denied.
Counsel shall prepare a judgment for entry in conformity with this decision.
[1] Hereinafter cited as "Tr."
[2] Petitioner believes that these funds were directed to him when he attained the age of 21, or 24, under another trust created by his grandfather. (Tr. 9, 67-68.) Although a copy of that trust has not been presented, the Court credits Petitioner's testimony that the funds were directed to him outright. (Tr. 68.) The Court finds the source of the funds is not critical to this case.
[3] Hereinafter cited as "Dep."
[4] Hereinafter cited as "Trust."
[5] Respondents allege that Petitioner actively misled them regarding the value of the trust estate (Post-trial Memorandum of Respondents 19.) Petitioner claims a dollar amount was not discussed when he contacted Respondents and any mistake was on their part. (Tr. 88-89.) The Court finds no basis in the evidence to conclude that Mr. Larmore acted in bad faith in this regard and does not believe this to be an important issue in the case.
[6] Passarelli should not be read broadly to require a heightened standard of proof for cancellation of all instruments due to undue influence. The Rhode Island Supreme Court has more recently stated clearly that "[t]he party contesting [a] will must prove undue influence by a preponderance of the evidence."Caranci, 708 A.2d at 1324. However, the state high court has approved the use of a heightened clear and convincing standard of proof for claims of undue influence where a deed was sought to be revoked. Tinney v. Tinney, 770 A.2d 420, 440 (R.I. 2001). The majority rule is that a "lower standard of proof of undue influence is required for wills and a higher one for contracts. . . ." 25 Am. Jur. 2d Duress and UndueInfluence § 47 (2006). Here, where the claim of undue influence regards an inter vivos trust, proof by a heightened standard of clear and convincing evidence is required.
[7] Although the cases relied upon by Petitioner are therefore unavailing under our laws, it should also be noted that they involved distinguishable circumstances. In Swenson, the court was willing to rely upon the third party influence exerted by the beneficiary's husband over the testator in creating a will naming her niece as an outright beneficiary. 92 Ill. App. 2d 88,234 N.E.2d at 102. In Montoya, the parents and grandfather of the grantee in an outright conveyance by deed were in a relationship with the grantor giving rise to a presumption of undue influence.823 P.2d at 909. Here, the influence would be attributed to the non-communicative Charles Brackett acting through attorney Cooper as his agent, the beneficiaries are somewhat more distantly related to Brackett, and the benefits received are contingent upon Petitioner dying without a resident wife or issue. Given these factual differences, it is debatable whether the foreign jurisdictions cited by Petitioner would further extend the presumption beyond its Rhode Island limitation.