DECISION
This matter is before the Court on Manufacturers and Traders Trust Company's motion for relief from subordination. The Court's jurisdiction is pursuant to G.L. 1956 § 34-28-16.
 I Facts and Travel
This is a consolidation of various mechanics' lien cases involving a large mill renovation project along the Pawtuxet River in West Warwick, Rhode Island. The focus of the instant motion is on one of the project's two properties, specifically, a 250-unit residential use project, known as Royal Mills at Riverpoint, located on Lot 11 of Assessor's Plat No. 26. Manufacturers and Traders Trust Company ("MT"), the holder of a fully-advanced $48,000,000 mortgage on this property, failed to timely respond to numerous citations issued to it and, consequently, lost *Page 4 
its priority as the first lien holder on the Royal Mills property.[1] MT then moved for relief from subordination under § 34-28-16 and for a determination of its priority as the first lien holder.
Beginning on May 4, 2009, and over the course of multiple hearing days, the Court heard testimony from three fact witnesses and one expert witness. MT first called Barbara Simmons, an administrative vice president of real estate finance, and group manager who managed the loan at issue. She had over 19 years of experience in commercial real estate lending. Ms. Simmons testified that when she became aware that mechanics' liens were being issued, she immediately notified MT's in-house legal department and Jane Wilson, MT's outside transactional counsel, pursuant to MT's standard procedure.
Ms. Simmons testified that it was her job to make sure the Bank was protected, and she took that job very seriously. Ms. Simmons described her constant communication with Ms. Wilson since the loan first closed in 2005. She further testified that she thought Ms. Wilson was fully representing MT at all times and that she never felt abandoned by Ms. Wilson in any way. When asked about a conflict letter issued on December 5, 2005, [2] she admitted she knew that *Page 5 
MT also represented the Struever Brothers[3] . However, although she understood from the conflict letter that a conflict could arise at a certain point and she was informed by Ms. Wilson that DLA Piper could not be actively involved in the mechanics' liens, she testified that she never thought a conflict arose.
Ms. Simmons testified that from the time the first lien was filed, her concern exponentially increased. She revealed that, as more citations were served, she had numerous conversations with the borrower, SBER Royal Mills, LLC, regarding the liens, and she knew the borrower was having conversations with tax credit investors. She additionally testified that the borrower had lied to MT about other problems, such as water damage at the property, and that they had provided inaccurate information on payment applications.
Throughout her testimony, Ms. Simmons stressed that she relied to her detriment on the care and vigilance of Ms. Wilson to advise her on how to handle the liens coming in. Ms. Simmons admitted that she did not review the liens as they were received, but only forwarded them to Ms. Wilson. When Ms. Simmons received the legal advice received from Rhode Island counsel Charles Sokoloff on December 4, 2008, she did not read it thoroughly because she relied on Ms. Wilson's cover letter that "it appear[ed] to [her] that MT is in first position." (Ex. 2, p. 0392.)
Although she admitted that the final decision for engaging local counsel was her responsibility, Ms. Simmons testified that she would only do so upon the advice from counsel. Ms. Simmons explained her ability to decide differently from her counsel's advice with her manager's approval, however, she took no action because Ms. Wilson did not advise her to contact local counsel; and Ms. Simmons did not think action was required. It was not until *Page 6 
February 1, 2009 when Ms. Simmons asked, "Jane, Can we try and set the call up with the local RI dude for the mechanics liens," Ex. 2, p. 0579, and February 2, 2009 when Ms. Simmons authorized Ms. Wilson to engage Mr. Sokoloff. (See Ex. 2, p. 0589.)
The Court also received direct testimony from MT's transactional counsel, Jane Wilson. Ms. Wilson was originally with the firm DLA Piper and then later joined Semmes, Bowes Semmes. She worked with Ms. Simmons over the course of 15 years and represented MT in transactions beginning in 1997. Attorney Wilson has over 21 years of experience in real estate finance.
Ms. Wilson first became aware that mechanics' liens were filed in 2008. Specifically, she received an e-mail copy of the first lien on June 19, 2008 from Ms. Simmons. Ms. Wilson further testified that at some point, she and Ms. Simmons discussed the fact that the borrower had told Ms. Simmons that the liens were not legitimate claims and that the borrower would be making some sort of proposal on how they would resolve them. In addition, Ms. Wilson testified that she had several conversations with Ms. Simmons, at least more than two, wherein they discussed the potential for tax investors to pay off the liens to protect their tax credit position. In fact, later in January 2009, Ms. Wilson had a conference call with Ms. Simmons, a tax credit representative, and the borrower to that effect.
Still, Ms. Simmons asked Ms. Wilson to find out what action MT should take. Ms. Wilson agreed to look at Rhode Island statutes to determine what course was necessary. She looked at Rhode Island's statutes relating to priority of open-ended mortgages and the Rhode Island Mechanics' Lien law. However, she could not recall particular sections, such as the section on subordination. After reading through the statutes, the law was not entirely clear to *Page 7 
Ms. Wilson; but she thought MT would remain in first position and did not understand that subordination was at risk. Ms. Wilson never contacted the lien holders for extensions.[4]
Ms. Wilson further testified that based on her knowledge now, it would certainly seem reasonable to read the entire statute. However, in June 2008, she was comfortable that she looked at the appropriate sections. When asked how long she performed research, she responded that she thought it was more than one-half hour. Nevertheless, she testified that she did not bill because it was not sufficient time worth billing.
Significantly, Ms. Wilson advised Ms. Simmons as her attorney, but tried to make clear that DLA Piper could not actively be engaged in litigation because of the conflict. Struever Brothers was also represented by DLA Piper. On October 3, 2008, she followed up with Ms. Simmons:
 Barb, where are we on the mechanics' lien filings? As you and I have discussed, Piper is not actively involved in these cases from a litigation standpoint. (Ex. 2, p. 0320.)
Ms. Simmons asked Ms. Wilson if she knew of any Rhode Island counsel who had relevant experience.[5] After asking around at her firm, Ms. Wilson called and subsequently emailed Charles Sokoloff. On December 1, 2008, Ms. Wilson asked:
 When informal research here indicated that the filed lien would not prime the Bank's mortgage and the borrower gave the Bank verbal assurances that the borrower was taking care of them, the Bank let the borrower run with it. As more liens have been filed (most recent one attached) and the borrower has done nothing to resolve the situation, the Bank has requested that we seek guidance from RI counsel regarding the Bank's position. The fundamental questions at this point are whether the liens in any way affect the Bank's mortgage lien position and, regardless of what the answer *Page 8 
is to the first question, whether it would be prudent for the Bank to take any action with respect to the liens. (Ex. 2, p. 363.)
Mr. Sokoloff responded: "The short answer to your question about whether it would be prudent for the Bank to take any action is — yes." (Ex. 2, p. 0386.) He also quoted the subordination statute and repeated,
 I think it would at least be prudent, and probably necessary, for the mortgagee to file an answer in the (each) pending civil action. . . . [C]lause (2) under subsection (a) of Section 34-28-16 seems to be a strong indication that a mortgagee is expected to file a timely entry of appearance and claim in the case. (Ex. 2, p. 0388.)
Ms. Wilson forwarded Mr. Sokoloff's advice to Ms. Simmons upon receipt and provided Ms. Simmons with his contact information in a subsequent e-mail. When forwarding Mr. Sokoloff's advice, Ms. Wilson advised:
 It appears to me that MT is in first position as we have always understood; however, Charlie is recommending that MT look into the mechanics' liens more closely and not sit back waiting for the Borrower to do something. Let me know how you want to proceed. (Ex. 2, p. 0392.)
Ms. Wilson did not recall having any later discussion with Ms. Simmons regarding his advice.
Ms. Wilson testified that after reading Mr. Sokoloff's response several times, she understood it to say that the Rhode Island Mechanics' Lien Law was a confusing statute and the answer was not entirely clear, but to avoid any doubt, the Bank should file an answer. She understood that an answer needed to be filed and that there may be an issue unless good cause was shown. However, she claimed she was not aware of the immediacy to file until early March 2009 after Mr. Sokoloff reviewed court records and contacted her to say that they should file as soon as possible. *Page 9 
In addition, Ms. Wilson testified that she thought she was within the conflict letter when she gave Ms. Simmons her initial, `informal' advice because if, in fact, no action was needed, then there was no litigation or irreconcilable dispute for the bank and borrower.
On cross-examination, Ms. Wilson claimed the conflict arose upon Mr. Sokoloff's advice of December 3, 2008. At that point, she stopped reading any lien process that was being forwarded to her. She testified that Ms. Simmons knew that Ms. Wilson could not represent MT while she was at DLA Piper, and that her discussions with Ms. Simmons renewed only when she went to her new firm. MT retained her at that time to represent it in the entire transaction, including the borrowers' default. Once again, she again contacted Mr. Sokoloff at the request of the bank.
The next witness to testify was Constance R. Pemmerl. Ms. Pemmerl, as an expert witness, described the ordinary relationship between a bank officer and its lead counsel, and the lead counsel and a bank's local counsel. She explained that in her experience, lead counsel was responsible to hire any special counsel needed in a particular matter, in this case, local counsel. The lead counsel would then engage the attorney and make a recommendation to the bank officer. Ms. Pemmerl explained that this was the normal procedure because bank officials have neither technical training nor knowledge to coordinate with local counsel.
In the same vein, the bank official would also look to lead counsel to analyze advice from local counsel and to advise on litigation matters. Ms. Pemmerl testified that the decision to answer a case in a lawsuit is essentially made by lead counsel. If lead counsel advises to answer, the bank official would authorize the lead counsel to take action depending on their level of authority. *Page 10 
Based on her review of the communications between Ms. Simmons and Ms. Wilson, Ms. Pemmerl testified that Ms. Simmons acted appropriately.[6] She reasoned that Ms. Simmons had worked with Ms. Wilson, who was from a prestigious firm and on a list of approved counsel for numerous years. When asked if it was reasonable for Ms. Simmons to rely on Maryland counsel on an opinion of Rhode Island law, Ms. Pemmerl responded that it was absolutely reasonable.
Throughout her testimony, Ms. Pemmerl emphasized that a bank official relies on his or her lead counsel. Nothing prevented the Bank from taking action but it would have been unusual. When asked on cross-examination if there were any extenuating circumstances that prevented the bank from filing an answer, Ms. Pemmerl responded that there was no reason the bank could not file with the court. There was no obstacle for Ms. Simmons to contact a third lawyer after received conflicting advice from Attorneys Sokoloff and Wilson. Ms. Pemmerl concluded that the bank retained Mr. Sokoloff, however, each decision was made upon the recommendation of Ms. Wilson. When asked if the safest course was to answer if Ms. Simmons was concerned with due diligence and the protection of the collateral, Ms. Pemmerl answered in the affirmative.
Finally, the lienors called Charles Sokoloff, who was eventually retained as MT's local counsel. Mr. Sokoloff testified that Ms. Wilson first contacted him for mechanics' lien advice on or before December 1, 2008. Mr. Sokoloff responded with a six-page opinion on December 3, 2008, wherein he indicated that yes, it would be prudent for MT to file answers to the citations. (See Ex. 2, pp. 0386, 0388.) He testified that he never spoke to anyone at the Bank and did not have any substantive conversations with Ms. Wilson following his e-mail to her, although, he did *Page 11 
recall speaking with her to make sure the research was what she wanted, and Ms. Wilson replied that it was very good. His next written contact with Ms. Wilson was not until February 2, 2009.
Attorney Sokoloff's consistent advice to Ms. Wilson was to file answers as soon as possible because some were quite old and that if notice was proper the return date would probably have passed.[7]
He stressed in his advice that it was prudent to file answers. In some of his conversations with Ms. Wilson, he made clear that the deadline passed and answers should be filed promptly. In fact, in an e-mail dated March 9, 2009, he warned:
 I want, again, to stress the urgency of filing answers to each of the cases as soon as possible. We are already well past the deadline for filing our answer in each of the cases. Allowance of our answer is in the discretion of the Court. (Ex. 2, p. 0701.)
When asked if he understood that the borrower or tax credit investor would take care of the liens, Mr. Sokoloff acknowledged that there was some discussion regarding this possibility. It was not until the end of February 2009 that Ms. Wilson authorized him to go forward with filing answers. On February 24, 2009, he noted in his file: "They are finally getting concerned about the viability of the borrower and would like me to move forward." (Ex. 2, p. 0802.) However, on March 2, 2009, his notes indicate
 [Jane Wilson] still does not have clear direction from the Bank as to how to proceed. I suggested that once I get more info from the Court as to the status of the various cases, perhaps she and I and the "workout counsel" should have a conference call.[8] (Ex. 2, p. 0804.) *Page 12 
Answers were approved by MT and filed on March 10, 2009.
After carefully considering the parties' written submissions and the lengthy testimony before the Court, the issue of MT's priority is ripe for discussion.
 Analysis
The Mechanics Lien Statutory Scheme.
The Rhode Island Mechanic's Lien statute is set forth chapter 34-28 of the General Laws. Generally, the statute allows persons who provide work or supply materials to a construction project to place a lien on the property and, under certain circumstances, to gain priority over other liens. In construing the mechanic's lien law, our high court has declared:
 Even though [the Mechanics Lien Law] is in derogation of the common law and therefore calls for strict compliance with its requirements, it nonetheless should be construed to carry out its purpose of afford[ing] a liberal remedy to all who have contributed labor or material[s] towards adding to the value of the property to which the lien attaches. Faraone v. Faraone, 413 A.2d 90, 91 (R.I. 1980), (internal quotations and citations omitted.)
Under the statute, a notice of intention to claim a lien must first be recorded on the title records. See section 34-28-4 et seq. A suit may then be filed with the Superior Court pursuant to § 34-28-10, and notice must be provided to creditors and claimants. See section 34-28-14. After the claims are contested, the Court may order a sale.See section 34-28-21.
Section 34-28-20 broadly permits that:
 [e]very defendant to any complaint and every person claiming to have a lien under § 34-28-1, 34-28-2 or 34-28-3 on the property described therein or on any part thereof, and every person claiming an interest therein by title, claim, lease, mortgage, attachment, or other lien or encumbrance, may contest the right of the plaintiff and of all others claiming a lien under this chapter to the property or any part thereof to any lien, as well as the amount of the claim. Section 34-28-20 (emphasis added).
The failure to promptly contest the claim results in the loss of a mortgagee's priority status: *Page 13 
 (a) The liens, under § 34-28-1, 34-28-2, 34-28-3 or 34-28-7, of all persons, . . . and the title, claim, lease, mortgage, attachment, or other lien or encumbrance of all persons who have any title, claim, lease, mortgage, attachment, or other lien or encumbrance . . . to or in the property which is the subject matter of the complaint, except the persons who have recorded the lien or encumbrance before the filing of the complaint and who have not been served with or mailed a citation as provided in § 34-28-15 and who have no actual knowledge, on or before the return day, of the pendency of the complaint, shall be subordinated to the claim of the plaintiff, and persons claiming liens pursuant to this chapter, and any other person having any mortgage, attachment, or other lien or encumbrance who have entered an appearance as a party in the cause, unless the person shall, within twenty (20) days after the return day, or within such other time as may be allowed by the superior court pursuant to Rule 60(b) of the Superior Court Rules of Civil Procedure enter an appearance as a party in the cause commenced by the complaint described in §§ 34-28-10 and 34-28-13 and shall file an answer as follows:
 (1) . . .
 (2) In the case of persons who have any title, claim, lease, mortgage, attachment, or other lien or encumbrance (other than under § 34-28-1, 34-28-2, 34-28-3 or 34-28-7), file a claim setting forth the particulars thereof and praying for the relief and priority to which the person shall deem himself or herself entitled.
 (b) . . .
 Section 34-28-16 (emphasis added).
Thus, the petitioner may only avoid subordination of its interests if it did not receive actual notice of the filing of a mechanic's lien or if it timely sought and was granted relief under Rule 60(b).
Under Rule 60(b) of the Rhode Island Rules of Civil Procedure, as incorporated into § 34-28-16, relief may be sought from subordination:
 [o]n motion and upon such terms as are just, . . . for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, *Page 14 
released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. . . . This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court. Super. R. Civ. P. Rule 60(b).
Excusable Neglect.
MT argues that it is entitled to relief from subordination under Rule 60(b)(1) because MT's conduct was excusable. "The existence of excusable neglect is a question of fact and must be established by evidence." Pleasant Management, LLC v.Carrasco, 960 A.2d 216, 222 (R.I. 2008) (internal quotations and citations omitted.) In making this determination, a trial justice should interpret excusable neglect flexibly, "taking account of all relevant circumstances surrounding the party's omission[,]" "`includ[ing] . . . the length of delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'" Id. at 225 (quotingConetta v. National Hair Care Centers, Inc.,182 F.R.D. 403, 406 (D.R.I. 1998)). However, the excusable neglect standard in Rule 60(b) does not address the issue of prejudice.
 Rather, the rules focus on the movant's reasons for missing the deadline, not on the effect of missing the deadline upon the opposing party. Therefore, a demonstration that the opposing party was not prejudiced is irrelevant to whether the movant's conduct constituted excusable neglect. The rules address the reasons for the neglect, not its duration or consequence. Astors' Beechwood v. People Coal Company, Inc., 659 A.2d 1109, 1116 (R.I. 1995). *Page 15 
Our Supreme Court has explained that "`[e]xcusable neglect that would qualify for relief from judgment is generally that course of conduct which a reasonably prudent person would take under similar circumstances.'" Pleasant Management, LLC,960 A.2d at 225 (quoting Pari v. Pari,558 A.2d 632, 635 (R.I. 1989)). The high court defined "excusable neglect" as
 [a] failure to take the proper steps at the proper time, not in consequence of the party's own carelessness, inattention, or willful disregard of the process of the court, but in consequence of some unexpected or unavoidable hindrance or accident, or reliance on the care and vigilance of his counsel or on promises made by the adverse party.[9] Pleasant Management, LLC, 960 A.2d at 224-25 (quoting Jacksonbay Builders, Inc. v. Azarmi, 869 A.2d 580, 584 (R.I. 2005) and Black's Law Dictionary
566 (6th ed. 1990)).[10]
In determining what conduct qualifies for relief, our Supreme Court has consistently held that the failure to know procedural rules is inexcusable. In Coutu v. Porter,744 A.2d 405, 406 (R.I. 1999), for example, the Court held that "the defendants' attorney's failure . . . to file a timely notice was fully within his control." Coutu, 744 A.2d at 406. The Court explained that
 [h]e had a responsibility to know the rules and procedures governing arbitration. . . . A reasonably prudent attorney would perhaps have contacted the arbitrator or the court when he had not received the award. At the very least, a reasonably prudent attorney in these circumstances would not have waited in silence until the time for rejecting an award had expired. Id.
See also Jacksonbay Builders, Inc.,869 A.2d at 584-85 ("[T]he [defendants'] failure to file a timely objection to the arbitration award because they were unfamiliar with the law did not present sufficient evidence for excusable neglect . . . The courts of this state cannot and will not entirely overlook established rules of procedure, adherence to which is necessary . . . [T]he *Page 16 
standard [is] that the neglect be occasioned by some extenuating circumstance of sufficient significance to render it excusable."); (internal citations excluded); c.f. Pleasant Management,LLC, 960 A.2d at 225 (finding excusable neglect where plaintiff's counsel violated the anti-contact rule and told the defendant that he did not have to appear).
In Phoenix Construction Co., Inc. v. Hanson,491 A.2d 330 (R.I. 1985), our Supreme Court specifically dealt with the application of Rule 60(b) in the mechanics' lien context. In that case, the mortgagees failed to timely file a claim in a mechanics' lien proceeding filed by a construction company.[11]
The mortgagees claimed that their reason for not filing a response was that they had been advised by their divorce attorney "not to worry about the writs." Id. at 332. After becoming apprised of the consequences for failing to timely answer, the mortgagees filed a motion to file a claim out of time. Notably, in concluding that the trial justice did not err in refusing to allow the mortgagees to file out of time, our Supreme Court explained that:
 [t]he controlling statutory provision mandates that the lien of all persons, including mortgagees, who are not otherwise excepted, "shall be void and wholly lost" unless they shall enter their appearance and shall file a claim as prescribed therein. Section 34-28-16. In addition, a case interpreting this statute has been determined to be in derogation of the common law and hence must be strictly construed. Id. at 333.
Notwithstanding our Supreme Court's use of the above-quotedBlack's Law Dictionary definition, [12] the Court has rarely excused a client for his or her counsel's inexcusable neglect. As the Court long ago reasoned, a
 fundamental of agency law . . . imputes the neglect of an attorney in professional matters to his client and considers the omissions of *Page 17 
the attorney as though they were the neglect of the client himself. . . . That principle points to the conclusion that a client should not be relieved of a default judgment resulting from the failure of his selected counsel to comply with procedural requirements, unless it is first factually established that his neglect was occasioned by some extenuating circumstances of sufficient significance to render it excusable. Unexplained neglect, standing alone and without more, whether it be of a party or of his attorney, will not automatically excuse noncompliance with orderly procedures. An efficient administration of the judicial system permits no other result. King v. Brown, 103 R.I. 154, 156, 235 A.2d 874, 875-76 (1967) (internal citations omitted) (emphasis added).[13]
Our Supreme Court has applied this doctrine stringently, imputing the negligence of a counsel to his client even where the parties stipulated that the client was not negligent. SeeBailey v. Algonquin Gas Transmission Co.,788 A.2d 478 (R.I. 2002) (failing to find excusable neglect where default was entered upon attorney's failure to respond to documents in personal injury action).
It has only been in limited circumstances that our Supreme Court has relieved a client of his or her counsel's inexcusable neglect, finding that an agency relationship no longer existed. For example, in Palazzolo v. Coastal Resources Management Council,657 A.2d 1050, 1052 (R.I. 1995), the Court concluded that it would be "unfair to impute to th[e] plaintiff the continuing dereliction of th[e] attorney when the plaintiff was making every effort short of violence to get the prior attorney out of his case."Id. The Court further observed that "that there was no longer an agency" because "[t]he original attorney in the present case not only abandoned the case by his inaction but frustrated his client's efforts to retain new counsel." Id.; see alsoShapiro v. Albany Ins. Co.,163 A. 747 (R.I. 1933) (per curiam) (finding that attorney abandoned the case *Page 18 
and left the state); Crossen v. Dudley,477 A.2d 107 (R.I. 1984) (attorney suspended from practice of law and failed to include plaintiff's name on list of clients).
In line with this principle, when an attorney's conduct is found to be excusable, the client is granted relief. SeeIddings v. McBurney, 657 A.2d 550, 553 (R.I. 1995). For example, in Iddings, our Supreme Court held that an attorney's medically documented disability constituted an extenuating circumstance of sufficient significance to render his neglect excusable. The Court explained that "in cases such as these, where the attorney has apparently led his or her clients to believe that their cases were being handled diligently, we believe it would be unfair to hold unwitting clients responsible for theexcusable neglect of his or her attorney."Id. at 554 (emphasis added). Hence, a client may be relieved from a default where the counsel was found to act with "care and vigilance." Pleasant Management, LLC,960 A.2d at 224-25 (quoting Jacksonbay Builders, Inc.,869 A.2d at 584 and Black's Law Dictionary 566).
Applying the Rule 60(b) standard to the evidence before the Court, and giving due regard to the policy of strict construction of the Rhode Island Mechanics' Lien Law, this Court concludes that MT has not met its burden of proving excusable neglect and, thus, may not file answers out of time. The record shows that MT began receiving citations in June of 2008. MT did not file answers to any of the citations until March 10, 2009. The reasons proffered by MT for responding late — in one action at least six months late — "fall[] light on excuse and heavy on neglect." Labossiere v.Berstein, 810 A.2d 210, 213 (R.I. 2002).
There was much discussion during hearing as to whether Ms. Wilson actually represented MT on the mechanics' liens throughout the entire relevant time period because of a conflict that arose at DLA Piper. Clearly, she continued to provide advice. However the Court does not reach this question, however, because both MT's and Ms. Wilson's conduct was inexcusable. *Page 19 
First, Ms. Wilson's conduct does not qualify for relief. As our Supreme Court has held multiple times, the failure to know court procedures and relevant law is insufficient. See e.g.,Jacksonbay Builders, Inc., 869 A.2d at 580.
Ms. Wilson's understanding of the Rhode Island Mechanics' Lien Law — or lack thereof — resulted only from her carelessness and inattention and thus was not excusable neglect. SeePleasant Management, LLC, 960 A.2d at 225. According to Ms. Wilson's testimony at hearing, she merely performed "informal research" in June 2008 upon receiving a copy of the first citation from Ms. Simmons. She testified that she looked through Rhode Island statutes on open-ended mortgages and only "believed" that she looked at the Rhode Island Mechanics' Lien Law but could not specifically recall any particular section. Her research was so minimal that she did not even bill for her time. Later, in December 2008, she had the advice of Rhode Island counsel that it would be prudent to answer, and Ms. Wilson admitted at hearing that she understood a response should be filed. Notwithstanding same, she did not file answers, even when she resumed her representation of MT at Semmes, Bowes Semmes.
Ms. Wilson continued to communicate with Ms. Simmons regularly. Even assuming, in arguendo, that Attorney Wilson did not continue to represent MT, she continued to lead Ms. Simmons to the conclusion that she was actively representing MT on this issue, even communicating with outside counsel independently, and providing advice.
Neither Ms. Wilson nor Ms. Simmons established "extenuating circumstances of sufficient significance to render [their inaction] excusable." King, 103 R.I. at 156, 235 A.2d at 876. Consequently, her inexcusable conduct must be imputed to MT according to longstanding principles of agency law and Supreme Court precedent. See King, 103 R.I. at 156, 235 A.2d at 875. *Page 20 
MT's conduct also "falls light on excuse and heavy on neglect."Labossiere, 810 A.2d at 213. While Ms. Simmons testified that she thought Ms. Wilson was representing her throughout the time in issue and that she never felt abandoned by Ms. Wilson, Ms. Wilson expressed her lack of involvement to Ms. Simmons in writing as early as October 3, 2008:
 Barb, where are we on the mechanics' lien filings? As you and I have discussed, Piper is not actively involved in these cases from a litigation standpoint. (Ex. 2, p. 0320.)[14]
The evidence reveals that Ms. Simmons may also not have been as involved in these liens as she suggested at hearing, or that Ms. Simmons selected another "strategy" for dealing with the liens. When forwarding Mr. Sokoloff's advice of December 3, 2008, Ms. Wilson told Ms. Simmons:
 It appears to me that MT is in first position as we have always understood; however, Charlie is recommending that MT look into the mechanics' liens more closely and not sit back waiting for the Borrower to do something. Let me know how you want to proceed. (Ex. 2, p. 0392.)
Ms. Simmons' Affidavit describes her strategy:
 Based on statements made by other parties, MT understood that active settlement discussions in early 2009 were likely to resolve all mechanics' lien claims against the property. After learning that these discussions had failed, MT promptly filed its answer, entry of appearance, statement of claim, and statement of priority in the consolidated mechanics' lien cases on March 10, 2009.[15] (Ex. 4.)
Even in-house legal department paralegal Lynn Loewer asked, on January 12, 2009, *Page 21 
 "Barb, Has your strategy changed at all in the handling of these matter given the number of lawsuits and the amounts involved? Please let me know if you have retained local counsel in Providence and the name of the firm and contact. . . ." (Ex. 2, p. 0464.)
Ms. Simmons responded, "Yes, while we believe we are still protected we have opted to now look to hire local counsel working with Jane since the liens are mounting in size. We will notify you of our selection." Id.
Significantly, it was not until January 2009 that MT decided to "hire local counsel." Id. Notwithstanding Ms. Wilson's description of Mr. Sokoloff's advice as "confusing," Ms. Simmons received straightforward advice from Rhode Island counsel on or about December 3, 2008:
 The short answer to your question about whether it would be prudent for the Bank to take any action is — yes. (Ex. 2, p. 0386.)
MT had this advice, which Ms. Simmons admitted she read, although not thoroughly, as well as Mr. Sokoloff's contact information, as early as December 4, 2008. (See Ex. 2, p. 0398.) ("[H]ere is the contact information for Charles Sokoloff. Charlie is a buddy of Ed Levin.") Still, it was not until February 1, 2009 that Ms. Simmons tried to get in touch with Mr. Sokoloff:
 "Jane, Can we try and set the call up with the local RI dude for the mechanics liens?" (Ex. 2, p. 0579.)
In fact, MT did not give the "go ahead" to engage Mr. Sokoloff until that day:
 Charlie, I shared your excellent analysis below with MT Bank when I received it several weeks ago. I have just received the go ahead from the Bank that they want to engage you with respect to the mechanics' lien issues on the Royal Mills project in West Warwick. Since I last corresponded with you, additional mechanics' liens have been filed. As the matter stands now, the historic tax credit investor in the deal is expected to make sufficient funds available to release all of the liens; however, since the total of liens filed is now closer to $2MM than the $200,000 the Borrower indicated would be the case, the Bank now agrees *Page 22 
that it should have RI legal advice regarding the mechanics' liens and what steps the Bank should take. . . . (Ex. 2, p. 0581.)
Even Mr. Sokoloff testified that there was discussion that the tax credit investors or the borrower would be taking care of the liens.
MT's failure to timely respond was not "in consequence of some unexpected or unavoidable hindrance or accident." PleasantManagement, LLC, 960 A.2d at 224-25 (quoting JacksonbayBuilders, Inc., 869 A.2d at 584). Rather, the credible evidence before the Court suggests that MT's inaction was calculated. MT chose to negotiate and not respond to litigation even after its own local counsel recommended a prompt response to the Court. Moreover, although MT provided expert testimony that it was reasonable for Ms. Simmons to blindly rely on her lead counsel, responding to the citations or hiring local counsel to do so was fully within her control. See Coutu, 744 A.2d at 406. Additionally, MT's own expert testified that nothing prevented the Bank from taking action and that there was no reason a filing could not have occurred. Nor was there any obstacle — other than obtaining permission from her manager — preventing Ms. Simmons from contacting a third lawyer after receiving conflicting advice from Mr. Sokoloff and Ms. Wilson.[16] Instead, Ms. Simmons persistently relied on the advice of out-of-state counsel, which conflicted with the advice that she received from Rhode Island counsel. Even though it may be argued that the advice was conflicting, Attorney Wilson never suggested that MT refrain from responding to the litigation. To minimize this risk, and avoid all conflict, MT could have simply answered the petition. *Page 23 
Ms. Simmons' lack of attention to the deadlines in the citations and the December 3, 2008 advice of Mr. Sokoloff, is inexcusable, especially after being notified by Ms. Wilson in October 2008 that she could not actively represent MT on the mechanics' liens. See id.; see also Ex. 2, p. 0320. This is not a case where MT was "tricked" by Ms. Wilson into believing that its case was being handled diligently. SeeLabossiere, 810 A.2d at 214.
Surely, a reasonably prudent person managing a fully-advanced $48,000,000 mortgage would be more proactive and attentive to the Bank's interest; particularly when the bank's exposure was significant, a multitude of liens were being filed, and MT knew the borrower was lying about water damage on the collateral property and providing inaccurate information on payment applications.See Pleasant Management, LLC, 960 A.2d at 225. Even if it was common practice for a bank official to blindly rely on lead counsel and never second-guess their advice does not make that official's inaction reasonable much less excusable. Consequently, MT is not entitled to relief under Rule 60(b)(1).
While it may be simple to cast all blame on Ms. Simmons, she was acting as an agent of MT. It is MT's unexcused negligence which is most profound. Ms. Simmons reports to others and others report to her, though it revealed no evidence of any intra-bank discussions or reports. Oddly, none of the internal reports on loan status or loan developments was ever produced. Ms. Simmons relied on in-house counsel, but none of their records were submitted to the Court. It is MT's failure to act, in the face of substantial, disclosed risk, which was never sufficiently explained. *Page 24 
Other Grounds.
MT also argued that relief should be provided pursuant to Rule 60(b)(6), which provides for relief for "any other reason justifying relief from the operation of the judgment." Super. R. Civ. P. Rule 60(b). Our Supreme Court has cautioned, however, that this section "is not intended to constitute a catchall," Bendix Corp. v. Norberg,122 R.I. 155, 158, 404 A.2d 505, 506 (1979), and
 if the neglect is inexcusable, thereby precluding any relief under Rule 60(b)(1), then that same inexcusable neglect cannot constitute the `other grounds' required to obtain relief under Rule 60(b)(6) unless other extraordinary and unusual factors also are present that would justify granting such relief. Bailey, 788 A.2d at 482-83.
Accordingly, this Court will not apply relief under this section:
 unless there has been a showing by appropriate evidence of circumstances that would establish a uniqueness that puts the case outside of the normal and usual circumstances accompanying failures to comply with the rules. In short, the evidence should establish that the peculiar circumstances pursuant to which the default judgment was entered, if permitted to stand, would work a manifest injustice. Greco v. Safeco Ins. Co. of America, 107 R.I. 195, 198, 266 A.2d 50, 52 (1970).
MT argues that the unique circumstances of this case entitle it to relief under Rule 60(b)(6). See id. In particular, MT argues that no final judgment or other order has been entered in this case which is different from the usual 60(b) case; that the statute is unclear; that MT received unfair notice; and that MT was being represented by counsel with a conflict of interest which prevented its counsel's ability to represent MT's interests. First, this Court has already determined that MT received due process and equal protection of the laws as guaranteed by our State and United States Constitutions. Second, MT knew about DLA Piper's conflict with the Struever Brothers. (See Ex. 2, p. 0320.) Finally, the evidence shows *Page 25 
that MT had it's own "strategy" in dealing with the liens and purposely dragged its feet in responding to the liens. Although it received advice in December 2008 from Rhode Island counsel that it would be prudent to answer the liens, MT did not authorize Ms. Wilson to engage local counsel until February 2, 2009, See
Ex. 2, p. 0589, and did not authorize participation in the Rhode Island litigation until much later.
Unlike a traditional Rule 60 motion to vacate a judgment, the mechanics lien statute specifies that automatic subordination may be excused only if the provisions of Rule 60 are met. A judgment is unnecessary.
MT has not established any "extraordinary and unusual factors" that justify relief under Rule 60(b)(6). Bailey,788 A.2d at 483. Consequently, MT is also not permitted relief under this subsection.
 Conclusion
After carefully considering the evidence presented to the Court and the arguments of the parties, and review of the established law, this Court finds that MT has failed to establish that it is entitled to relief from subordination under Rule 60(b), pursuant to § 34-28-16(a). Accordingly, MT has lost its priority as to all lienors to whom it untimely answered.
[1] The following chart reflects when particular citations were due and when MT untimely answered:
Petitioner Answer due Answer filed
Joseph Tavone Painting Co., Inc. August 22, 2008 March 10, 2009
Northern Site Contractors, Inc. October 10, 2008 March 10, 2009
Sheridan Electric, Inc. October 24, 2008 March 10, 2009
Eagle Carpet, Inc. December 8, 2008 March 10, 2009
Graybar Electric Company, Inc. December 12, 2008 March 10, 2009
Gem Plumbing Heating Company, Inc. December 31, 2008 March 10, 2009
Westbay Welding Fabrication, Inc. December 31, 2008 March 10, 2009
Kitchens International, Inc. December 31, 2008 March 10, 2009
Northeast Steel Corporation Inc. January 23, 2009 March 10, 2009
Jesmac, Inc. February 1, 2009 March 10, 2009
J. D. Cement Works, Inc. February 13, 2009 March 10, 2009

[2] In this letter addressed to MT's legal department, Ms. Wilson advised that a conflict of interest would arise out of the Firm's representation of MT with respect to the loan at issue and sought MT's consent to DLA Piper's representation of MT on the loan. MT subsequently signed and returned this letter. (Ex. 2, p. 0760.)
[3] Streuver Brothers, through various corporate and LLC names, (such as SBER Royal Mills, LLC.) is the developer of the projects.
[4] The record reflects that the in-house legal department contacted one lienor for an extension, which was subsequently granted. Apart from that, the extent of the in-house legal department's involvement is scant.
[5] It appears that Ms. Simmons asked Ms. Wilson for her assistance in finding local counsel at some point in November. On November 23, 2008, Ms. Simmons followed-up, "Have you caught up to local counsel yet? I have to start beating on them about RM. Barb." (Ex. 2, p. 0340.)
[6] It must be stressed that this is not a negligence case and that Ms. Pemmerl was not testifying to the standard of care of a bank official. Rather, MT used Ms. Pemmerl's testimony to attempt to explain why Ms. Simmons did not contact Mr. Sokoloff directly, regardless of whether this inaction was legally right or wrong.
[7] Mr. Sokoloff did not receive a citation with Ms. Wilson's initial e-mail and, thus, thought notice may have been defective.
[8] In an e-mail from Ms. Wilson to Mr. Sokoloff on March 9, 2009, she indicated that she asked Ms. Simmons to contact Pat Cameron, the bank's workout/bankruptcy counsel, to confirm that he had no concerns before Mr. Sokoloff filed answers:
 Given the time sensitivity of getting the filing done, Barb and I both thought that we should go ahead and get the filing done first and then set up a call on next steps. Again, as soon as I hear back from Pat and confirm that he agrees with that approach, I will let you know immediately. (Ex. 2, p. 0723.)
[9] This standard is higher than the "good cause" showing required under Super R. Civ. P. Rule 55(c). See Reyes v.Providence Place Group, L.L.C.,853 A.2d 1242, 1248 (R.I. 2004) ("Excusable neglect is a more rigorous standard than good cause, and it requires a party to show that the neglect was occasioned by some extenuating circumstances of sufficient significance to render it excusable.") (internal quotations and citations omitted).
[10] Our Supreme Court first adopted this definition inAstors' Beechwood, 659 A.2d at 1116, wherein it found inexcusable an attorney's excuse that he "overlooked" a procedural requirement because it was "an extremely busy time."
[11] Default was also entered against the mortgagees in a civil action filed by the construction action. Phoenix ConstructionCo., Inc., 491 A.2d at 333.
[12] MT relies heavily on a particular phrase in theBlack's definition used by our Supreme Court. Specifically, that a party's conduct is excusable when there is "`reliance on the care and vigilance of his counsel. . . .'" Pleasant Management,LLC, 960 A.2d at 224-25 (quoting Jacksonbay Builders,Inc., 869 A.2d at 584 andBlack's Law Dictionary p. 566). It is a reasonably prudent person who acts with care and vigilance. See id. At 225. Therefore, surely the conduct of a counsel who acts with care and vigilance would be found excusable.
[13] In Pioneer Investment Services Co. v. Brunswick AssociatesLimited Partnership,507 U.S. 380, 396-97, 113 S.Ct. 1489, 1499 (1993), the United States Supreme Court emphasized that the client "voluntarily chose this attorney as his representative in the action, and he [could not] now avoid the consequences of the acts or omissions of this freely selected agent." The proper focus, the Court explained, "is upon whether the neglect of [the clients] and their counsel was excusable." Id.
[14] MT references these two lines repeatedly to support its contention that Ms. Wilson's attorney relationship was limited. While the notice of confidentiality letter of December, 2005 supports the non-representation, Ms. Wilson's continued assistance and advice to MT, is completely inconsistent with the letter. Ms. Wilson's extensive, continued involvement with the loan negates any claim of non-representation. Even before Ms. Wilson left the conflicted firm she was receiving all of the mechanics lien notices and controlling all communications with MT's Rhode Island counsel. (See Ex.2, p. 0363.) In fact, Ms. Wilson represented MT.
[15] Curiously, Ms. Simmon's affidavit avers that citations were served between August 2008 and January 2009, and that she consulted with Ms. Wilson after receiving the first citation in August. The evidence shows that citations were first received in June 2008. (See Ex. 2, p. 0262.)
[16] While Ms. Simmons acknowledged during testimony that extensive e-mails and internal reports were generated routinely for these significant mortgages, no internal communications (within MT) were placed into evidence. While hundreds of pages of communications with MT and its outside attorneys were placed into evidence, MT never submitted even a monthly status report or a report by Ms. Simmons to her supervisor. Nor were communications from or to the in house counsel submitted, although in house counsel requested an extension on one petition.